1 | Kenneth M. Sigelman, Esq. (SBN: 100238)
E-Mail: ken@sigelmanassociates.com
2 | Andrew R. Chivinski (SBN: 236861)
E-Mail: andrew@sigelmanassociates.com
3 | KENNETH M. SIGELMAN & ASSOCIATES
1901 1st Ave., 2nd floor
4 | San Diego, California 92101
Telephone: (619) 238-3813
5 | Facsimile: (619) 238-1866

6 | Attorneys for Plaintiff

7

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF THE STATE OF CALIFORNIA**

10

11 | I. PEREZ, a minor, by and through his Guardian ad Litem, ISRAEL PEREZ; and NORMA PEREZ,

**Case No. 16CV1911-JAH-MDD**

12

13 | Plaintiff,

Hearing Date:    May 14, 2018
Hearing Time:    2:30 p.m.
Courtroom:    13B
Judge:    Hon. John A. Houston

14 | v.

15 | UNITED STATES OF AMERICA; and DOES 1 through 20, Inclusive,

16

17 | Defendants.

18

19 | **EXHIBITS TO PLAINTIFFS' MOTION IN LIMINE NO. 7 OF 8**

20

21

22

23

24

25

26

27

28

1

EXHIBIT 1

EXHIBIT 1

1            UNITED STATES DISTRICT COURT

2       SOUTHER DISTRICT OF THE STATE OF CALIFORNIA

3   _____
                               )

4   I. PEREZ, a minor, by and    )
    through his Guardian Ad     )

5   Litem, ISRAEL PEREZ; and     )
    NORMA PEREZ,                  )

6                              )
        Plaintiff,           )

7                              )
        vs.                ) CASE NO. 16CV1911-JAH-MDD

8                              )
  UNITED STATES OF AMERICA;   )

9   and DOES 1 through 20,      )
    Inclusive,             )

10                             )
                             )

11         Defendants.        )
  _____)

12

13

14

15

16         DEPOSITION OF MARK A. GUSTAFSON

17          LOS ANGELES, CALIFORNIA

18        TUESDAY, DECEMBER 12, 2017

19

20

21 Reported by:  Kyung Lee-Green
              CSR. No. 12655, CLR

22

23

24

25

1        A      So that would be added as well.  We can go

2    through and count them if you want to.

3        Q      Okay.  So you're saying there's five times

4    that you've given testimony?  Well, let me ask the

5    question a different way.

6        A      Sure.

7        Q      On how many occasions have you given

8    deposition testimony?

9        A      I -- I think I said approximately four.

10       Q      Okay.  And are you able to tell me which of

11   these cases were the ones where you gave deposition

12   testimony?

13       A      Yes.

14       Q      Which ones?

15       A      ADT versus ADT U.S. Hold -- or am --ADT U.S.

16   Holdings --

17              (Reporter clarification.)

18   BY MS. PHILLIPS:

19       Q      You talk a little quickly.  If you could slow

20   down a little.

21       A      ADT and ADT U.S. Holdings versus Vivent.

22       Q      Okay.

23       A      Susan Chan versus Delta Dental.

24       Q      Okay.

25       A      Hunter Run Apartments versus WCA Waste, Corp.

```
 1          Q    I'm sorry.  Where -- where's that one?
 2          A    Third from the bottom.
 3          Q    Oh, there it is.  Okay.
 4          A    Stevenson versus Bank of New York.  That was
 5     both trial and deposition testimony.
 6          Q    Okay.  But -- so those four were the -- all of
 7     the cases where you have given deposition testimony in
 8     your career; correct?
 9          A    And deposition testimony, yes.  And then
10     yes -- I'm sorry.
11          Q    Wait till I ask.
12          A    That's why I stopped.
13          Q    I'll get there.  All right.
14               And on how many occasions have you testified
15     at trial?
16          A    Twice.
17          Q    And in which cases did you do that?
18          A    Stevenson versus Bank of New York.
19          Q    And what was the other one?
20          A    That was The Women's Care Center versus
21     San Joaquin Community Hospital.
22          Q    Is that --
23          A    That's the one that's not here because that
24     happened the week before Thanksgiving.
25          Q    Okay.  And, I'm sorry.  What was name -- name
```

```
 1   of that again?
 2        A     The Women's Care Center versus San Joaquin
 3   Community Hospital.
 4        Q     Okay.  So with respect to the -- that ADT
 5   case, and you said it was meant -- it was inadvertently
 6   submitted twice; is that right?
 7        A     Yeah.  I mean --
 8        Q     Listed twice?
 9        A     -- it's just listed twice.
10        Q     Okay.  So that's not two different things?
11        A     No.
12        Q     All right.  Can you tell me just very briefly
13   what that case was about?
14        A     Allegations related to deceptive sales
15   practices by the defendant.
16        Q     Okay.  And in -- in Susan Chan versus
17   Delta Dental, can you just briefly describe for me what
18   that case was about?
19        A     Sure.
20              Dr. Chan claimed that Delta Dental did not
21   refer patients to her appropriately, and she was suing
22   for what she felt was a reduction in business because of
23   the lack of referrals.
24        Q     Okay.  Incidentally, who retained you in that
25   case?
```

```
 1        A     Delta Dental.

 2        Q     And in the ADT case, who retained you?

 3        A     Vivint.

 4        Q     And then this Hunter's Run Apartments, what

 5   was that about?

 6        A     That was a case -- a class action related to

 7   fuel surcharges.

 8        Q     And who did you represented -- who -- strike

 9   that.

10              Who retained you in that case?

11        A     WCA.

12        Q     Okay.  And then we've got the Stevenson versus

13   Bank of New York case.  Can you just briefly describe

14   for me what that case was about?

15        A     Mr. Stevenson was an executive with Bank of

16   New York.  He was asked to go to a bank in Switzerland

17   that was unrelated to Bank of New York.  He agreed to

18   go, assuming that he could come back to BNY and was

19   promised that he could return.  When he tried to come

20   back later, they didn't rehire him.  So he was suing for

21   the lost benefits, for failing to be rehired.

22        Q     Okay.

23              And who retained you in that case?

24        A     Mr. Stevenson.

25        Q     And then this Women's Care Center case, now in
```

1    that one, you just gave trial testimony?  No depo?

2         A    They -- they chose not to depose me.

3         Q    Okay.  And what was that case about?

4         A    It was related to reduction in block --

5    surgery block time and claims that the hospital failed

6    to renew a contract.

7         Q    Okay.

8              So -- and in that case, who retained you?

9         A    San Joaquin Community Hospital.

10        Q    All right.  So just to summarize a little bit.

11   It looks like in cases where you have given either trial

12   or deposition testimony, none of them have included

13   personal injury or medical malpractice cases; is that

14   correct?

15        A    Yes, that's true.

16        Q    And of these cases, five cases where you've

17   given testimony, either at trial or deposition, you've

18   represented the plaintiff once and the defendant the

19   remaining times; is that correct?

20        A    I think its once for the plaintiff and

21   four times for the defendant, yes.

22        Q    Okay.

23             Can you give me some sense for how many times

24   prior to this case you have done work that involved

25   quantifying a life care plan?

1       Q       Okay.  And then -- now, it -- the idea of

2    Exhibit 2 is it is showing how you went about

3    calculating your net discount rate for the loss of

4    earning capacity claim?

5       A       Correct.

6       Q       And you've got the expected effective tax

7    rate.  Can you explain to me how that ties into the net

8    discount rate?

9       A       So the return that you're going to get from

10   investing in the -- the five-year treasury bond, that is

11   taxable income.  So it needs to be reduced by the tax

12   rate because you're not going to get the benefit of the

13   amount you pay in taxes.

14      Q       I see.  Okay.  I think I got it.

15              And then the next column is the rolling

16   12 months CPI increase, and I just wanted to clarify a

17   couple of things about that.

18      A       Sure.

19      Q       First of all, when you talk about a rolling

20   increase, what do you mean?

21      A       It's basically looking at an annual average,

22   but it's for the -- that month and the prior 11 months.

23   So instead of a -- a monthly number, it's looking at an

24   annual num -- number.  But it averaged over the --

25   the -- the 12 observations that make up that year or

```
 1   that prior year.
 2        Q    Okay.  And you used CPI, and that's
 3   Consumer Price Index?
 4        A    That is correct.
 5        Q    And the Consumer Price Index, what sorts of
 6   things is in -- well, let me try it another way.
 7             Can you explain what the Con -- the Consumer
 8   Price Index is?
 9        A    It's -- there are different types of measures.
10   This is a -- it's a -- it's a measure of changes in
11   prices for the consumer space.
12        Q    Does it measure changes in prices of
13   everything?
14        A    This is -- particular index, it's the CPI
15   index for all urban consumers.  So it's -- those --
16   those baskets of goods consumed by urban consumers.
17        Q    And you said "baskets of goods."  Is it goods
18   only --
19        A    Good and services.
20        Q    -- or does it include services?
21        A    Sorry.  I should have let you finish.
22        Q    So -- so it measures what people -- how much
23   people are spending on these various items; correct?
24        A    No, it's --
25        Q    No, it doesn't?
```

1      A      It measures the price levels, not the

2  expenditure level.

3      Q      What's the difference between the price lev --

4  level and the expenditure level?

5      A      If you buy -- if a gallon of milk is $2, then

6  the price level is $2.  If you buy five gallons of milk,

7  you're paying $10.  So it's not -- the question is

8  vague.

9              You could have paid $10, or you could -- you

10  would have paid $10.  So when you said is it measuring

11  expenditures, it's unclear to me.  Are you measuring the

12  $10 you paid or are you measuring the $2 price?

13      Q      Okay.  So maybe you can clarify this for me

14  just a little bit.  When you say that it measures the

15  change of prices, is it attempting to determine the

16  price of every single item that is sold anywhere in the

17  marketplace?

18      A      No.

19      Q      How is it determined what's included?

20      A      The -- they have a basket of goods that they

21  measure at just incremental points in time, and they

22  figure out the prices of that basket of goods.  And

23  they -- they figure out how much you would -- it cost to

24  buy the basket of goods at one point in time, the next

25  point in time, and then they -- they look at the change

1    in price between those two time periods.

2        Q    Okay.  And can you explain to me why you would

3    use that rather -- rather than the amount that wages

4    increase in determining a net discount rate that applies

5    to a claim for loss of earning capacity?

6        A    Sure.  There's a couple of reasons.  I mean,

7    first as -- as I articulate in my rebuttal report, I

8    understand that there's guidance from the courts on what

9    the proper method to use is and that the evidentiary

10   foundation for why you would use wage growth isn't

11   present, or at least wasn't -- Johnson and Mills didn't

12   provide --

13              (Reporter clarification.)

14              THE WITNESS:  Mills.  Didn't provide that --

15   that basis.  So that would mean that the rate wasn't

16   wage growth, but it was general CPI.

17              And more from an economic perspective, I think

18   the -- one of the problems with wage growth, at least

19   that -- what Johnson and Mills used is that their figure

20   was an economy-wide wage growth number.

21              If one were to decompose that into wage growth

22   for men and wage growth for women, what you would see is

23   that the wage growth for men is basically flat, the wage

24   growth for women is increasing.  So when you look at the

25   overall number, wage growth is going up, but that --

1    that's driven by the increase in wages for women.

2            So because you -- they're taking a -- a

3    male-specific number and then applying this general wage

4    growth, what you're seeing is that it -- you're --

5    you're estimating an increase, not because of wage

6    growth wages for men are increasing, but because wages

7    for women are increasing.

8    BY MS. PHILLIPS:

9        Q    Why would that mean that you should use the

10   Consumer Price Index?

11       A    So the -- there's the first part of the

12   question which applied to that.

13            And then if you were to look at the wages for

14   men, what you'll find is that there really isn't a big

15   difference.  So --

16       Q    Between what and what?

17       A    If you look at the CPI and you look at the

18   wage growth for men, specifically white men, over the

19   time frame that I was able to get wage growth for white

20   males, there really wasn't a large difference between

21   CPI and wage growth for white men.  So whether you use

22   CPI or an appropriate wage growth index, the answer is

23   about the same.

24       Q    Okay.

25            Is either one of them a reason -- I mean, I --

1    I'm still trying to figure out what the econ -- ec --

2    economic -- the economist reason is for using the

3    Consumer Price Index and determining the appropriate net

4    discount rate for a claim for loss of earning capacity.

5            You mentioned a legal analysis.  Then there

6    was this economist analysis where you thought that the

7    wage growth for men was flat.  And I understand that.

8    I'm still missing why you would then decide to use the

9    CPI.

10        A    So we're -- we're in a legal proceeding.  So

11   the analysis that we do has to be -- take guidance from

12   the -- the guardrails that the courts are putting in.

13            So the -- the -- the court cases that I've

14   looked at, and they explicitly said CPI is the right

15   thing to use so that -- that does support part of the

16   choice for using CPI.  And when we're looking at the

17   economic kind of piece of it, whether that there's --

18   you get to the same place whether you use wage growth

19   or -- or CPI basically --

20            (Reporter clarification.)

21            THE WITNESS:  Whether you use CPI or wage

22   growth.  So whether you want to -- so you -- they're --

23   they're basically getting you to the same place.

24   BY MS. PHILLIPS:

25        Q    Okay.  But it -- I mean, just sort of

Page 47

```
1    intellectually, is there any reason to use CPI as
2    opposed to growth rate -- rate for white males?
3         A    If one is doing a study outside the context of
4    litigation or what?
5         Q    Well, I guess what I'm just trying to figure
6    out is -- is why, if you're trying to figure out
7    basically how -- how much wages are going to increase,
8    among other things, and then how much you're going to
9    discount them, wouldn't it make more sense to measure
10   how much wages have increased as opposed to what people
11   are paying for goods and services?
12        A    So I think we have to look at in the context
13   of litigation.  So we can't discard guidance that courts
14   have given.
15        Q    Sure.
16             But as an economist, is there any -- I -- I
17   understand you're suggesting that there's a legal reason
18   to do it.  But I'm sort of hoping to get your opinions
19   as an economist rather than as a legal scholar today.
20             So, as an economist, is there any reason to
21   use the CPI that you're aware of?
22        A    So I think -- that's what I'm saying.  You get
23   to the same place whether you use the CPI or wage
24   growth.  When it's an appropriate wage growth number,
25   you'll end up at a -- about the same place.
```

```
 1    that trend, but I couldn't find any research that I
 2    could point to.
 3        Q    Okay.
 4             Now, the fringe benefits --
 5        A    Yes.
 6        Q    -- how did you go about selecting the number
 7    you were going to use for fringe benefits?
 8        A    If we look here.  I looked at the employer
 9    cost for employee compensation from the BLS and looked
10    at the different categories of benefits and looked at
11    those where it was clear that he would be -- Ian Perez
12    would receive value in the future.  So those are the
13    ones that I used for this 13.18 percent number.
14        Q    So maybe you can clarify that for me for a
15    little bit.
16        A    Sure.
17        Q    So your labor statistics includes fringe
18    benefits other than the ones you included, but you
19    thought those were benefits where you would not receive
20    value?
21        A    So it -- where there's speculation with regard
22    to what the value would be in the future.  So I think --
23        Q    So --
24        A    -- what you might --
25        Q    What are the categories that they list?
```

1      A    So, generally, it's things like insurance or

2    retirement are included in this number.   Not included in

3    the number are things like unemployment insurance or a

4    disability insurance and -- sorry.   Are you done

5    writing?

6      Q    No, don't -- don't worry about my writing.   Go

7    ahead.

8      A    Also not included in the number was

9    Social Security and Medicare, the employer contribution.

10     Q    Okay.   And that -- that's because you don't

11   believe that he would receive any value from those

12   things?

13     A    One of the things that I -- I brought today

14   was a -- an analysis that looked at Medicare and

15   Social Security, to just make you aware of that.

16          But to answer your question.   So, for example,

17   on unemployment insurance or disability insurance, what

18   that's doing is the employer is paying insurance

19   premiums that would benefit the employee if they become

20   disabled or if they become unemployed.   The lost

21   earnings capacity analysis we're doing assumes no

22   periods of unemployment and assumes no periods of

23   disability.

24          So we're basically paying Ian Perez for

25   assuming he would never be disabled, that he would never

1    be unemployed.   So, therefore, there's no benefit.   He

2    already has the benefit of the unemployment insurance,

3    the disability insurance because he can't, in this

4    hypothetical but-for world, ever be unemployed or ever

5    be disabled.

6         Q      Okay.   And what about Social Security and

7    Medicare?

8         A      So, with regard to -- for both of them, I

9    think there's a degree of speculations as to what those

10   programs will look like in the future.   We know what

11   they look like today.   There's some -- a possibility

12   that they will be changed in the future.   And what that

13   would be -- with regard to Medicare --

14              (Reporter clarification.)

15              THE WITNESS:   -- medicare.   With regard to

16   Medicare.

17              I understand he's insured by TRICARE.   So to

18   the extent his medical needs are covered by TRICARE,

19   that would be redundant with Medicare coverage.

20              There's also a question of whether he would be

21   or wouldn't be receiving those benefits in the future.

22   So -- or I guess any individual may or may not receive

23   those benefits in the future.   If you don't reach

24   Medicare age or Social Security age, you might not get

25   them.   If you delay getting Social Security, you might

```
1            THE WITNESS:  I believe it is the best and
2    safest investment.  I'm a little confused by his
3    statement that -- that you'd be able to invest it today
4    because if you look at his 90 -- 90-day treasury bill
5    rate, if you look at the average over the -- the time
6    period we're talking about, the average is 4.4 percent.
7    So to the extent he's saying my rate isn't available
8    today, his rate isn't either.
9            So I don't understand how any critiques he's
10   making of me doesn't apply to him.
11   BY MS. PHILLIPS:
12       Q    Any other comments about his criticisms of
13   your use of the discount rate?
14       A    No.
15       Q    All right.  Then the third category was income
16   tax adjustments, any comments you would make in response
17   to his criticisms?
18       A    Just that I think that he's incorrect.
19       Q    Well, can you tell me all the reasons you
20   think he's incorrect?
21       A    Because from a economic perspective the
22   benefit that Ian Perez would realize would be in
23   after-tax wages that he would earn.  So to calculate the
24   pre-tax wages would overcompensate him and provide him
25   benefits that he wouldn't actually realize in the
```

1    but-for world.

2         Q     Okay.  Any other comments about that?

3         A     No.

4         Q     And about the fringe benefits, is that one

5    that you have now with -- is he commenting about

6    something you have now withdrawn?

7         A     I guess yes and no.  Yes, in the sense that

8    I -- I provided you a schedule that included Medicare

9    and Social Security.  The rates that he used are

10   actually different than the rates I used.  And my rates

11   are higher.  I think his are lower.

12              And the -- these -- the rates he uses are in

13   the source.  But I think he's not using the source

14   correctly.  So he comes up with different numbers.

15        Q     Okay.  Let -- maybe you better explain that a

16   little bit.  When you say his numbers are in "the

17   source," what do you mean by "the source"?

18        A     So the -- maybe I should -- I should step

19   back.  He doesn't really state his source so I can't say

20   whether they are or are not in the source.

21              But the -- the statutory rate is 7.6.  It's

22   higher than this.  The statutory rate --

23        Q     The statutory rate for what --

24        A     -- for Medicare and social security taxes, the

25   employer contribution is higher than this.  There is a

REPORTER'S CERTIFICATION

I, Kyung Lee-Green, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true and correct record of the testimony and proceedings taken at that time;

That before completion of the deposition, review of the transcript ( x ) was ( ) was not requested; ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not an attorney or counsel of any parties, nor am I a relative or employee of any attorney or counsel of the party connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have subscribed my name this 26th day of December, 2017.

_____
Kyung Lee-Green
Certified Shorthand Reporter No. 12655, CLR

174

EXHIBIT 2

**Expert Report**

**of**

**Mark A. Gustafson**

**In the Matter**

**of**

*I. Perez et al.,*

*v.*

*The United States of America*

# Table of Contents

I.     ASSIGNMENT ................................................................................................. 1

II.    QUALIFICATIONS .......................................................................................... 1

III.   DOCUMENTS RELIED UPON ....................................................................... 1

IV.    SUMMARY OF OPINIONS ............................................................................ 2

V.     BACKGROUND .............................................................................................. 2

VI.    QUANTIFICATION OF ALLEGED LOSS OF FUTURE EARNING
       CAPACITY ....................................................................................................... 3

       A.     Assumptions and Inputs Necessary to Calculate Damages ................... 4

              1.     Analysis Date ................................................................................ 4

              2.     Education and Worklife Expectancy ............................................ 4

              3.     Earnings ........................................................................................ 5

              4.     Taxes ............................................................................................. 7

              5.     Net Discount Rate ......................................................................... 8

       B.     Quantification of Lost Earning Capacity ............................................. 11

VII.   CONCEPTUAL APPROACH TO CALCULATION OF THE PRESENT
       VALUE OF EXPENSES FROM PLAINTIFF'S LIFE CARE PLAN ........... 12

Appendix A ................................................................................................................ 13

Appendix B ................................................................................................................ 26

ANALYSIS GROUP, INC.

**Expert Report of Mark A. Gustafson**
*I. Perez et al., v. The United States of America*

## I.    ASSIGNMENT

1.  I have been retained by counsel for the United States of America ("USA"), in the matter of *I. Perez et al. v. USA*, pending in the United States District Court, Southern District of California.  I have been asked by counsel to quantify Ian Perez's alleged loss of earning capacity and to determine the appropriate interest rates to discount Plaintiffs' future medical expenses to current dollars.  I was also asked to review work submitted by Plaintiffs related to either of these topics.

2.  I have no opinion regarding liability in this matter.

## II.    QUALIFICATIONS

3.  I am a Vice President with Analysis Group with over 15 years of experience working on litigation and non-litigation engagements.  I have worked across numerous practice areas including employment disputes, wrongful termination, insurance, health care, class actions, commercial damages, and public policy.  I have provided expert testimony on behalf of both a plaintiff and defendants.

4.  I earned a Master of Public Policy with a concentration in economics from the Kennedy School of Government at Harvard University where I also taught graduate-level economics as a course assistant.

5.  A copy of my curriculum vitae summarizing my background and qualifications is attached as **Appendix A** to this report.

6.  Analysis Group is compensated at my hourly rate of $560 per hour for my time spent on this matter.  I have directed the work of other Analysis Group staff members with hourly billing rates ranging from $275 to $300.  Neither Analysis Group's nor my compensation is dependent in any way on the outcome of this case.

## III.    DOCUMENTS RELIED UPON

7.  In preparing this report, I reviewed among other materials the complaint, Plaintiffs' Responses to Defendant's First Set of Interrogatories, the depositions of Israel and Norma Perez,

ANALYSIS GROUP, INC.

several court opinions pertaining to similar cases, and data from the Federal Reserve and a number of government sources such as the United States Census Bureau, the Bureau of Labor Statistics ("BLS"), and the Internal Revenue Service.

8.   A list of documents and data sources that I reviewed and considered in this matter is given in **Appendix B** to this report and/or in the text of this report and its accompanying exhibits.

## IV.    SUMMARY OF OPINIONS

9.   The opinions I have reached in this matter as of the date this report was submitted are as follows.

- Assuming liability, I believe Ian Perez's lost earning capacity is $1.77 million as of July 27, 2016 or $1.81 million as of July 31, 2017, the "Analysis Dates" described below.[1]
- As noted above, Counsel for the United States asked me to review discount rates developed by Plaintiffs' experts for future medical care expenses. I will issue a supplemental expert report after Plaintiff's experts submit their reports and I have completed my review. I reserve my right to develop independent, and alternative, discount rates if appropriate.
- I understand Ian Perez is eligible for and receives TRICARE medical insurance from the United States. I may be asked to quantify and back out medical expenses contained in plaintiffs' life care plan that are covered by TRICARE.

10. My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as appropriate.

## V.    BACKGROUND

11. On December 31, 2013, Ian Perez was born at Naval Hospital Camp Pendleton ("NHCP"), a United States Naval Hospital located on the Marine Corps Base Camp Pendleton in San Diego, California.[2]  NHCP and the Naval Medical Clinic ("NMC") in Camp Pendleton

---

[1] *I. Perez et al. v. The United States of America*, Complaint for Personal Injuries, July 27, 2016 ("Complaint").

[2] Complaint, ¶¶ 1, 2, 5, 12.

ANALYSIS GROUP, INC.

provided care to Israel, Norma, and Ian Perez during and subsequent to Ian Perez's delivery.[3]  I understand that NHCP and NMC are operated and under the control of the Defendant, USA.[4]

12. Plaintiffs allege that negligent care provided by staff at NHCP and NMC caused Ian Perez to sustain permanent injuries at birth, while his mother, Norma Perez, sustained "mental, physical, and nervous pain and suffering."[5]  Plaintiffs allege that the medical care provided by staff at NHCP and NMC "fell below the standard of care" and will "continue to cause him [Ian Perez] permanent injury in his health and physical ability."[6]  Plaintiffs allege Ian Perez's injuries at birth have caused "permanent brain injury" as well as "pain and suffering."[7]  In addition, Plaintiffs allege that Ian Perez has and will continue to incur economic damages such as medical costs and a loss of future earning capacity due to the injuries sustained at birth.[8]

## VI.    QUANTIFICATION OF ALLEGED LOSS OF FUTURE EARNING CAPACITY

13. A loss in future earning capacity may occur in cases of personal injury and reflects a loss in the ability to earn money in the future.[9]  I understand that a loss in future earning capacity reflects "not what the plaintiff would have earned in the future but what she could have earned."[10]  Plaintiffs allege that the injuries sustained by Ian Perez at birth have caused a loss in his future earning capacity.[11]  Assuming liability, I believe Ian Perez's lost earning capacity is $1.77 million as of July 27, 2016 or $1.81 million as of July 31, 2017.

---

[3] Complaint, ¶¶ 12, 20.

[4] Complaint, ¶ 5.

[5] Complaint, ¶¶ 24-29.

[6] Complaint, ¶¶ 25-26.

[7] Complaint, ¶¶ 22, 26.

[8] Complaint, ¶¶ 28-29.

[9] "A Plain English Approach to Loss of Future Earning Capacity," 24 Washburn L.J. 253 1984-1985, accessed on August 25, 2016, available from HeinOnline at www.heinonline.com, pp. 253-254.

[10] *Hilliard v. A. H. Robins Co.*, Civ. No. 62162, Court of Appeals of California, Second Appellate District, Division One, October 27, 1983, accessed on May 3, 2017, available from http://law.justia.com/cases/california/courtofappeal/3d/148/374.html.

[11] Complaint, ¶ 28.

ANALYSIS GROUP, INC.

### A.  Assumptions and Inputs Necessary to Calculate Damages

14. As of the date this report is submitted, Ian Perez is a young child who, therefore, has no work history, education, or chosen career field.  In order to determine reasonable compensation to Ian Perez for the alleged loss in future earning capacity, I must make a number of assumptions about what he could have done and how it could have affected his future earnings.  **Exhibit 1** and **Exhibit 2** outline these assumptions and model inputs, which are explained in detail below.

#### 1.  *Analysis Date*

15. Counsel for the United States instructed me to calculate Ian Perez's lost earnings capacity as of two dates: the date of the complaint, which is July 27, 2016, and July 31, 2017.[12]  I refer to these dates as the Analysis Date.

16. I reserve my right to re-calculate damages based upon an alternative date in the event counsel or the Court instructs me to do so.

#### 2.  *Education and Worklife Expectancy*

17. I make the following assumptions regarding the education that Ian Perez could have obtained and how long he could have worked after obtaining this education.  See **Exhibit 1**.

- Education Level – I assume that Ian Perez could have obtained a bachelor's degree at age 22, and that he could have graduated around May 15, 2036.  Norma Perez holds a high school diploma and a medical assistant certification and Israel Perez holds an Associate's degree in criminal justice, a Bachelor's degree in criminal justice, and is working on a Master's degree in Humanities.[13, 14, 15]

- Beginning of Work Life – I assume that Ian Perez could have started working on July 1, 2036.  This is about a month and a half after I assume Ian Perez could have graduated with a bachelor's degree.

---

[12] Complaint.

[13] Responses to Defendant The United States' First Set of Interrogatories to Plaintiff, February 28, 2017 ("Interrogatories"), pp. 3-4.

[14] Deposition of Norma Perez, May 2, 2017 ("Norma Perez Deposition"), pp. 14-17.

[15] Deposition of Israel Perez, May 3, 2017 ("Israel Perez Deposition"), pp. 10-13.

ANALYSIS GROUP, INC.

- Retirement Date – I assume that Ian Perez could have remained in the work force until age 67, and he could have retired on his 67th birthday, December 31, 2080. This means that Ian Perez could have been in the workforce for approximately 44.5 years.[16] This assumption is consistent with the normal retirement age given by the Social Security Administration for those born in or after 1960.[17] This is conservative relative to Ian Perez's but-for worklife expectancy, which is 41.1 years on average for men with at least 15 years of schooling according to the BLS.[18]

3.      *Earnings*

18. I make the following assumptions about what Ian Perez could have earned given the above assumptions about Ian Perez's educational attainment and worklife expectancy. See **Exhibit 1**.

- I assume Ian Perez will be unable to work in the future due to his injuries that were allegedly caused by NHCP and NMC. Therefore, I assume that Ian Perez suffered a total loss in future earning capacity.

- I assume that Ian Perez could have earned $71,385 per year in 2015 dollars, which is the median amount for males with a bachelor's degree in 2015 according to the United States Census Bureau.[19] This assumption means that Ian Perez could have earned in the middle of the distribution of earnings for males with a bachelor's degree. In other words, fifty percent of males with a bachelor's degree would have earned more than Ian Perez and fifty percent would earn less. As of the date

---

[16] There are 16,254 days from July 1, 2036 to December 31, 2080. These 16,254 days are equivalent to 16,254 / 365.25 = 44.5 years.

[17] "Retirement Planner: Benefits by Year of Birth," Social Security Administration, accessed on August 8, 2017, available from https://www.ssa.gov/planners/retire/agereduction.html.

[18] "Worklife Estimates: Effects of Race and Education," U.S. Department of Labor, Bureau of Labor Statistics, February 1986, Bulletin 2254, accessed on October 21, 2016, available from https://www.bls.gov/opub/reports/worklife-estimates/archive/worklife-estimates-1986.pdf , p. 5. I assume that Ian Perez could have had at least 15 years of schooling had he entered university after graduating high school in grade 12, and obtained his bachelor's degree in four years.

[19] Table P-24. Educational Attainment--Full-Time, Year-Round Workers 25 Years Old and Over by Median Earnings and Sex, United States Census Bureau, Historical Income Tables: People, accessed May 1, 2017, available from https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-income-people.html.

5

ANALYSIS GROUP, INC.

I submit this report, more recent earnings data are not available. I adjust the 2015
amount to make it current as of the Analysis Date of each scenario.

- I adjust the 2015 median earnings for males with a bachelor's degree to July 2016
  or July 2017 dollars by using the growth in average weekly earnings from the
  BLS over the time period from December 2015 to July 2016 or July 2017,
  depending on the Analysis Date.[20] For the Analysis Date of July 27, 2016, 2015
  median earnings are adjusted upwards by 0.62% due to the increase in Average
  Weekly Earnings from $366.40 to $368.67 from December 2015 to July 2016.[21]
  As of the date this report is submitted, Average Weekly Earnings data is only
  available through June 2017, making some additional computation necessary
  when adjusting 2015 median wages to July 2017 dollars. Average Weekly
  Earnings increased from $366.40 to $371.76 from December 2015 to June 2017,
  representing a 1.46% increase.[22] In order to account for the expected increase in
  Average Weekly Earnings from June 2017 to July 2017, the average monthly
  increase in Average Weekly Earnings from December 2015 to June 2017 is added
  to the 1.46% above. The expected increase in Average Weekly Earnings over this
  additional month is 0.08%.[23] This results in an expected increase in Average
  Weekly Earnings from December 2015 to July 2017 of 1.54%.[24]

- I assume that Ian Perez could have also received fringe benefits in addition to
  wages as part of his total compensation. Fringe benefits include insurance and
  retirement and savings benefits.[25] The average fractions of total compensation

---

[20] Average Weekly Earnings of All Employees, 1982-1984 Dollars, Bureau of Labor Statistics, accessed August 8,
2017, available from https://data.bls.gov/timeseries/CES0500000012.

[21] 0.62% = 368.67 / 366.40 -1. See, Average Weekly Earnings of All Employees, 1982-1984 Dollars, Bureau of
Labor Statistics, accessed August 8, 2017, available from https://data.bls.gov/timeseries/CES0500000012.

[22] 1.46% = 371.76 / 366.40 - 1. See, Average Weekly Earnings of All Employees, 1982-1984 Dollars, Bureau of
Labor Statistics, accessed August 8, 2017, available from https://data.bls.gov/timeseries/CES0500000012.

[23] 0.08% = (1 + 1.46%) ^ (1/18) - 1. See, Average Weekly Earnings of All Employees, 1982-1984 Dollars, Bureau
of Labor Statistics, accessed August 8, 2017, available from https://data.bls.gov/timeseries/CES0500000012.

[24] 1.54% = 1.46% + 0.08%.

[25] The categories supplemental pay and paid leave are already included in the Census Bureau's calculation of median
earnings, so they are not included in my calculation of fringe benefits in order to avoid double counting. See,
Current Population Survey (CPS), Subject Definitions, United States Census Bureau, accessed July 19, 2017,
available from https://www.census.gov/programs-surveys/cps/technical-documentation/subject-definitions.html.

ANALYSIS GROUP, INC.

that these benefits comprise are tracked by the BLS. Data from the BLS on the preceding two categories of fringe benefits are available from 2004 to 2016.[26] I find the average of each of the two categories of benefits from 2004 to 2016 and sum those averages to calculate the total fringe benefits Ian Perez could have received.[27] This calculation yields the assumption that Ian Perez could have received fringe benefits equal to 13.2% of his total compensation. The addition of fringe benefits increases damages by 15.2% relative to wages alone.[28]

4.    Taxes

19. Any income that Ian Perez could have earned in the future would be subject to federal income taxes. Because Ian Perez would not have use of money paid in taxes, his after-tax earnings are the earnings relevant to the quantification of his lost earning capacity. I note as well that the money paid in federal income tax would have been paid to the USA, which is the defendant in this matter. I make no adjustment for state or local taxes.

20. Since the amount of federal income taxes owed depends on a number of factors in addition to income, such as charitable giving and tax-deductions for retirement contributions, an assumption regarding what Ian Perez's tax rate would have been is necessary.

21. I assume that Ian Perez would pay an effective federal income tax rate of 8.60%, which is the average effective tax rate for people with an adjusted gross income from $50,000 to $75,000 per year in 2014.[29] This assumption means that Ian Perez would have paid taxes at an effective rate that is the average for people earning roughly the same amount as I assume he could have earned. This implicitly assumes that the impact of factors such as charitable giving and tax deductions for retirement contributions on Ian Perez's tax burden would be consistent

---

[26] Employer Costs for Employee Compensation, Bureau of Labor Statistics, accessed May 2, 2017, available from https://www.bls.gov/ncs/ect/sp/ececqrtn.txt.

[27] Employer Costs for Employee Compensation, Bureau of Labor Statistics, accessed May 2, 2017, available from https://www.bls.gov/ncs/ect/sp/ececqrtn.txt.

[28] Receiving fringe benefits equal to 13.2% of total compensation means that earnings from wages represent 100% - 13.2% = 86.8% of total compensation. Therefore, earnings from wages must increase by 1 / 0.868 -1 = 0.152, or 15.2%, to account for fringe benefits.

[29] SOI Tax Stats - Individual Statistical Tables by Size of Adjusted Gross Income, All Returns: Selected Income and Tax Items, Tax Years: 2014, Internal Revenue Service, accessed on April 28, 2017, available from https://www.irs.gov/uac/soi-tax-stats-individual-statistical-tables-by-size-of-adjusted-gross-income. Data for 2014 were the most recently available as of the date I submit this report.

ANALYSIS GROUP, INC.

with the average taxpayer with income similar to what Ian Perez could have earned. Adjusting for federal income tax on his future earning reduces the estimate of lost earning capacity by the amount of the effective tax rate or 8.60%. See **Exhibit 1**.

22. It is important to note that no adjustment for taxes on any lump sum payment made to Plaintiffs for the alleged loss in Ian Perez's earning capacity needs to be made. I understand that the Internal Revenue Service does not tax "compensatory damages, including lost wages, received on account of a personal physical injury."[30] This means that although the amount that Ian Perez could have earned each year in the future should be adjusted to account for taxes that he would have owed, Plaintiffs will not owe taxes on any lump sum damage payment that may be received in this litigation.[31]

### 5.    Net Discount Rate

23. To determine the value of Ian Perez's lost earning capacity as of the date of his injury, I need to determine the present value of the stream of future cash flows he could have earned. To do this, I calculate a net discount rate based on the expected interest rate for United States Treasury bonds and the expected rate of future inflation. Having a net discount rate balances two offsetting factors. First, Plaintiffs could invest any damage award in risk-free Treasury bonds, allowing the award to grow over time. Second, the wages that could have been earned by Ian Perez would grow in the future due to inflation.

24. The amount that Ian Perez would earn on the award invested in Treasury bonds is taxable. Therefore, the interest rate must be adjusted for the expected tax rate to determine an after-tax interest rate.

---

[30] "Lawsuits, Awards, and Settlements Audit Techniques Guide," Internal Revenue Service, accessed on May 3, 2017, available from https://www.irs.gov/pub/irs-utl/lawsuitesawardssettlements.pdf.

[31] This statement is based on my understanding of tax law, and I am not offering an opinion related to taxes or providing tax advice.

ANALYSIS GROUP, INC.

25. The net discount rate I use is defined as:

$$Net\ Discount\ Rate$$
$$= Average\ Treasury\ Bond\ Yield\ After\ Taxes$$
$$- Average\ Inflation\ Rate$$

26. Using the above net discount rate, an increase in the average Treasury bond yield increases the net discount rate, while an increase in the average inflation rate decreases the net discount rate. Thus, an increase in the average Treasury bond yield will decrease the present value of the lost earning capacity, while an increase in the average inflation rate will increase it. I use the Consumer Price Index ("CPI") to measure inflation. I understand that the concept of a net discount rate has previously been used in other medical malpractice and disability cases.[32] The use of a net discount rate is also well documented in academic literature.[33]

27. To determine the average Treasury bond yield after tax, I use the five-year United States Treasury bond rate. Since the expected duration of the injury period is assumed to be the entirety of Ian Perez's lifetime with a work life expectance up to age 67, five-year United States Treasury bonds represent an investment with appropriate maturity. The term of the five-year Treasury bonds balances the desire of the investor to receive a higher return while not unduly reducing liquidity. In simpler terms, the Plaintiff would be able to invest the money at a rate that is higher than shorter term Treasury instruments, but would still be able to reinvest or withdraw funds in five year intervals. In addition, I understand that the *Veasley* court accepted five-year Treasury bond rates as appropriate bases for discount rates because they represent the "best and safest investments" and do not require in-depth investment or stock picking expertise.[34] To

---

[32] *Veasley et al. v. United States of America*, Case No. 12-cv-3053-WQH-WVG, United States District Court, Southern District of California, August 12, 2016, accessed October 14, 2016, available at https://cases.justia.com/federal/district-courts/california/casdce/3:2012cv03053/403278/114/0.pdf; *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 541-46, 103 S.Ct. 2541, 2552-55, 76 L.Ed.2d 768, February 28, 1983, accessed July 14, 2017, available from Legal Information Institute at https://www.law.cornell.edu; *Trevino et al. v. United States of America*, Case No. 85-4136, United States Court of Appeals, Ninth Circuit, decided November 28, 1986; and *McCarthy et al. v. United States of America*, Case No. 87-3917, United States Court of Appeals for the Ninth Circuit, filed March 28, 1989.

[33] Hubbard, R. G., & O'Brien, A. P. (n.d.). Chapter 9 Unemployment and Inflation. In *Macroeconomics* (5th ed., pp. 284-285). Upper Saddle River, New Jersey: Pearson Education, Inc. and Brush, B. C. (2003). Risk, discounting, and the present value of future earnings. *Journal of Forensic Economics, 16*(3), 263-274.

[34] *Veasley et al. v. United States of America*, Case No. 12-cv-3053-WQH-WVG, United States District Court, Southern District of California, August 12, 2016, accessed October 14, 2016, available at https://cases.justia.com/federal/district-courts/california/casdce/3:2012cv03053/403278/114/0.pdf.

9

ANALYSIS GROUP, INC.

determine the average yield, I calculate the average yield on five-year Treasury bonds using data from the period April 1953 through April 2017, which is the entire period for which data were available from the Federal Reserve Bank of St. Louis when I downloaded the data.  The average yield is 5.59%.[35]  Because it is unknown how interest rates will change over approximately the next 60 years, using the average of the entire 64 year time period available in the data provides the best estimate of the average interest rates until Ian Perez reaches his assumed retirement age of 67.  See **Exhibit 2**.

28. Ian Perez would pay federal income taxes (but not state and local taxes) on any interest received from investing a lump sum award in United States Treasury bonds.[36]  For this reason, it is necessary to adjust the average Treasury bond yield to account for federal income taxes.[37]  As discussed above, I assume that Ian Perez could have paid an average effective tax rate of 8.60%.  Accounting for future taxes produces an Average Treasury Bond Yield After Taxes of 5.11%.[38]  See **Exhibit 2**.

29. I calculate that the expected average change in CPI is equal to 3.54%, which is the average increase in the CPI calculated monthly on a rolling twelve month basis from April 1953 through April 2017, the same time period over which the average Treasury bond yield was measured.[39]  By using 3.54%, I am assuming that Ian Perez's wages starting at the Analysis Date could have grown by the average rate of inflation from April 1953 through April 2017.  See **Exhibit 2**.

30. Subtracting the average increase in CPI from the Average Treasury Bond Yield After Taxes results in a net discount rate of 1.57%.[40]  See **Exhibit 2**.

---

[35] 5-Year Treasury Constant Maturity Rate (GS5), Federal Reserve Bank of St. Louis, FRED Economic Data, accessed May 1, 2017, available from https://fred.stlouisfed.org/series/GS5.

[36] "Publication 550, Investment Income and Expenses," Internal Revenue Service, accessed May 15, 2017, available at https://www.irs.gov/pub/irs-pdf/p550.pdf, p. 11.

[37] Based on my understanding of federal income taxes, income from Treasury bonds would be taxed as ordinary income at Ian Perez's average effective tax rate. See, "Topic 403 - Interest Received," Internal Revenue Service, accessed August 4, 2017, available from https://www.irs.gov/taxtopics/tc403 html.

[38] $5.11\% = 5.59\% * (1 - 0.086)$.

[39] Consumer Price Index for All Urban Consumers: All Items (CPIAUCSL), Federal Reserve Bank of St. Louis, FRED Economic Data, accessed August 8, 2017, available from https://fred.stlouisfed.org/series/CPIAUCSL#0.

[40] $1.57\% = 5.11\% - 3.54\%$.

10

**B.     Quantification of Lost Earning Capacity**

31. In order to calculate damages from the loss in earning capacity of Ian Perez assuming liability, I first determine the amount that he could have earned each year, adjusted for a number of factors. I then use the net discount rate to calculate the value of these earnings as of each of the Analysis Dates.

32. As discussed above, I assume that Ian Perez could have earned $71,385 per year, in 2015 dollars assuming he earned a bachelor's degree. The first step in calculating Ian Perez's lost earning capacity is to convert the 2015 median earnings for males with bachelor's degrees to July 2016 and July 2017 dollars (depending on the Analysis Date) by inflating the 2015 amount by the increase in average weekly pay reported by the BLS from the end of 2015 through the month of the Analysis Date. This results in an increase in earnings of 0.62% for the Analysis Date of July 27, 2016 and an increase of 1.54% for the Analysis Date of July 31, 2017, as discussed above. The second step is to reduce the amount for federal income taxes using the effective tax rate of 8.6%. To do this, I multiply Ian Perez's estimated July 2016 or July 2017 wages by 91.4%, which is equal to 100% less the effective tax rate of 8.6%.[41] Finally, I account for fringe benefits that Ian Perez could have received by increasing his wages by 15.2%. Factoring in the above adjustments yields adjusted yearly earnings of $75,612 in July 2016 dollars and $76,307 in July 2017 dollars. See **Exhibit 3** and **Exhibit 4**.

33. Using the adjusted yearly earnings above, I discount that amount in each year that Ian Perez could have worked, taking into account that 2036 would have been a partial work year. This yields the present value as of the Analysis Date of the adjusted earnings for each year. The sum of these values for the years from 2036 to 2080 is equal to Ian Perez's lost earning capacity as of the Analysis Date, which is equal to $1,766,830 as of July 27, 2016 and $1,811,330 as of July 31, 2017. See **Exhibit 5** and **Exhibit 6** respectively.

---

[41] 91.4% = 100% - 8.6%.

11

ANALYSIS GROUP, INC.

## VII.   CONCEPTUAL APPROACH TO CALCULATION OF THE PRESENT VALUE OF EXPENSES FROM PLAINTIFF'S LIFE CARE PLAN

34. I understand that Plaintiffs will submit a life care plan describing their predicted future medical expenses for Ian Perez.  Upon receiving the life care plan, I will calculate the present value of the medical expenses described using the timing of each expense provided in the plan.  My calculation of the present value of the items in the life care plan may include using a discount rate or net discount rate that is broadly tied to medical expenses, specifically tied to a certain type of medical good or service, or another rate that I determine to be economically appropriate depending on the type of expenses included in the life care plan.

35. I also understand Ian Perez is eligible for and receives TRICARE medical insurance from USA.[42, 43]  I may be asked to quantify and back out medical expenses contained in Plaintiffs' life care plan that are covered by TRICARE.

36. I reserve the right to update my opinion and methodology as appropriate upon receipt of Plaintiffs' proposed life care plan.

Signed on the 25th day of August, 2017, at Los Angeles, CA

---

[42] Norma Perez Deposition, p. 51.

[43] Israel Perez Deposition, p. 18.

12

ANALYSIS GROUP, INC.