1   JOSEPH H. HUNT
    Assistant Attorney General
2   Civil Division

3   JAMES G. TOUHEY, JR.
    Director, Torts Branch
4
    ROGER D. EINERSON
5   Deputy Director, Torts Branch

6   STEPHEN R. TERRELL (Cal. Bar No. 210004)
    Attorney
7   Torts Branch
    United States Department of Justice
8   P.O. Box 888
    Washington, DC  20044
9   (202) 353-1651 (phone)
    (202) 616-5200 (fax)
10  Stephen.Terrell2@usdoj.gov

11  Attorneys for Defendant
    UNITED STATES OF AMERICA
12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15  I. PEREZ, a minor, by and through his    )   Case No.: 16-cv-1911-JAH-MDD
    Guardian ad Litem, ISRAEL PEREZ;         )
16  and NORMA PEREZ,                         )   **UNITED STATES' POST-TRIAL**
                                             )   **BRIEF**
17                          Plaintiffs,      )
                                             )   Hon. John A. Houston
18             vs.                           )
                                             )   Courtroom:  13B
19  UNITED STATES OF AMERICA;                )   Date:        N/A
    and DOES 1 through 20, Inclusive,        )   Time:        N/A
20                                           )
                            Defendant.       )
21                                           )
                                             )
22  _____     )

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  PROPOSED FINDINGS OF FACT ...................................................................6

    A.   Standard of Care/Breach. ........................................................................6

    B.   Causation ...............................................................................................13

    C.   Damages .................................................................................................15

III. PROPOSED CONCLUSIONS OF LAW .........................................................18

    A.   Standard of Care/Breach .......................................................................18

    B.   Causation ...............................................................................................19

    C.   Damages .................................................................................................20

        1.   Past economic damages. .............................................................20

        2.   Future economic damages...........................................................21

            a.   Net discount rates. ...........................................................21

            b.   Lost earning capacity. ......................................................22

            c.   Future medical expenses...................................................22

            d.   Other future care items. ...................................................23

        3.   Non-economic damages...............................................................24

        4.   Offset..........................................................................................24

IV.  ARGUMENT......................................................................................................24

    A.   The United States Did Not Breach the Standard of Care.......................24

    B.   Plaintiffs' Life Care Plan is Flawed. .....................................................30

    C.   Application of California's Periodic Payment Statute. ..........................32

        1.   The statute does not require "gross value" evidence. .........................32

        2.   Form of judgment........................................................................35

    D.   TRICARE. ..............................................................................................37

    E.   Comparable Judgments. ........................................................................38

V.   CONCLUSION...................................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Am. Bank & Trust Co. v. Cmty. Hosp.*, 36 Cal.3d 359 (1984)...........................................34

*Brooks v. United States*, 337 U.S. 49 (1949) ................................................................37

*Canavin v. Pac. Sw. Airlines*, 148 Cal. App. 3d 512 (1983) ...........................................21

*Cibula v. United States*, 664 F.3d 428 (4th Cir. 2012) .............................................22, 33

*Colleen v. United States*, 843 F.2d 329 (9th Cir. 1987)..................................................21

*Conrad v. United States*, 447 F.3d 760 (9th Cir. 2006)..................................................18

*Corenbaum v. Lampkin*, 215 Cal. App. 4th 1308 (2013) ................................................32

*Dutra v. United States*, 478 F.3d 1090 (9th Cir. 2007) ..................................................22

*Espinosa v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304 (1995) ..............................19

*Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345 (1963) .............................................20

*Greenleaf v. United States*, 1999 Jury Verdicts LEXIS 52874 .......................................38

*Hanif v. Hous. Auth.*, 200 Cal. App. 3d 635 (1988) ................................................20, 21

*Huffman v. Lindquist*, 37 Cal.2d 465 (1951) ...............................................................25

*I.P. v. United States*, No. 2:13-CV-01012-JAM-CKD, 2015 WL 8036075 (E.D. Cal. Dec. 7, 2015) ...............................................................................................................34, 38

*Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396 (1985)...........................................20

*Lattimore v. Dickey*, 239 Cal. App. 4th 959 (2015) ......................................................18

*MacDonald v. United States*, 900 F. Supp. 483 (M.D. Ga. 1995)....................................38

*Markow v. Rosner*, 3 Cal. App. 5th 1027 (2016)...........................................................32

*Mays v. United States*, 806 F.2d 976 (10th Cir. 1986) ..................................................37

*McCarthy v. United States*, 870 F.2d 1499 (9th Cir. 1989)..............................................22

*Meier v. Ross General Hosp.*, 69 Cal. 2d 420 (1968)................................................25, 28

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014)...................................25

*Miranda v. Bomel Const. Co.*, 187 Cal. App. 4th 1326 (2010) ........................................20

*Nguyen v. Los Angeles Cty. Harbor/UCLA Med. Ctr.*, 40 Cal. App. 4th 1433 (1995).....36

*OST, Inc. v. United States*, 140 Fed. Cl. 662 (2018) ................................................23, 37

*Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266 (2018) ......................22, 32

*Peters v. Lines*, 275 F.2d 919 (9th Cir. 1960) ...............................................................20

*Pfeifer v. Jones & Laughlin Steel Corp.*, 462 U.S. 523 (1983) .........................................21

*Phillips v. W. Co. of N. Am.*, 953 F.2d 923 (9th Cir. 1992) .............................................24

*Pulte Home Corp. v. Am. Safety Indem. Co.*, 14 Cal. App. 5th 1086 (Cal. App. 2017) ....20

*Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607 (2018) .................................25

*Salgado v. Cty. of Los Angeles*, 19 Cal. 4th 629 (1998) ...............................................33

*Sanchez v. Rodriguez*, 226 Cal. App. 2d 439 (1964) ....................................................25

*Schiernbeck v. Haight*, 7 Cal. App. 4th 869 (1992) ......................................................34

*Scott v. Rayher*, 185 Cal. App. 4th 1535 (2010) ...................................................19, 21

*Shaw v. United States*, 741 F.2d 1202 (9th Cir. 1984) ................................................21

*Smith v. United States*, No. 09-cv-246, 2012 WL 3017704 (W.D. Pa. July 23, 2012) .....38

*Taylor v. United States*, 821 F.2d 1428 (9th Cir. 1987) ...............................................24

*Trevino v. United States*, 804 F.2d 1512 (9th Cir. 1986)...........................................21, 22

*United States v. English*, 521 F.2d 63 (9th Cir. 1975)..................................................33

*Veasley v. United States*, 201 F. Supp. 3d 1190 (S.D. Cal. 2016)........................21, 34, 38

*Walden v. United States*, 31 F. Supp. 2d 1230 (S.D. Cal. 1998) ...................................21

*Yates v. Pollock*, 194 Cal. App. 3d 195 (1987)............................................................24

**Statutes**

28 U.S.C. § 2041 ........................................................................................................36

28 U.S.C. § 2674 ........................................................................................................18

28 U.S.C. § 2678 ........................................................................................................36

Cal. Civ. Code § 3333.2 ..............................................................................................24

Cal. Civ. Proc. Code § 667.7...............................................................................passim

**Other Authorities**

CACI 3903A ...............................................................................................22, 23, 30

CACI 501 ..................................................................................................................26

CACI 505 ..................................................................................................................25

Horvitz & Levy, MICRA Manual (2012) ...........................................................................36

**Rules**

Fed. R. Civ. P. 67 ...........................................................................................................36

**Regulations**

32 C.F.R. § 199.6 ......................................................................................................23, 37

## I.      INTRODUCTION

The evidence at trial overwhelmingly demonstrated that a team of dedicated healthcare professionals at Naval Hospital Camp Pendleton ("NHCP") appropriately managed Norma Perez's labor and delivery during the four hours and one minute between the time she entered NHCP and the time of delivery of her son, I. Perez. Although Norma Perez presented with variable decelerations, those decelerations resolved in response to the team's intra-uterine resuscitative measures.  Those intra-uterine resuscitative measures were the measures set out in guidance issued by the American College of Obstetricians and Gynecologists ("ACOG") and taught to obstetricians: intravenous ("IV") fluids; position changes; oxygen; if warranted, tocolytics; and, if warranted, amnioinfusion.  By 2:00 a.m.—30 minutes after admission—Ms. Perez's variable decelerations had largely resolved and the team was focused on pain control (including planning for an epidural) and closely monitoring the baby's condition.  All within the standard of care.  Even plaintiffs' obstetrical expert does not critique the care provided during this period.

The team appropriately responded to the isolated prolonged variable deceleration that began at approximately 2:35 a.m.  They promptly commenced an IV bolus, Ms. Perez was already on oxygen, the team repositioned her to right lateral then hands and knees, and they administered Terbutaline (a tocolytic).  By 2:46 a.m., when Lieutenant Commander Jenkins examined Ms. Perez, the prolonged variable deceleration had resolved and the fetal heart tones had returned to Category I (*i.e.*, normal).

As stated by ACOG, "*[i]f* . . . prolonged decelerations . . . *do not resolve*, then prompt delivery is recommended."  JX-91-005 (marked for identification only) (emphasis added).  Instead, because the prolonged variable deceleration resolved and because Ms. Perez's strip again displayed moderate variability by 2:46 a.m., ACOG recommends "Continued surveillance + Intrauterine resuscitative measures."  *Id.* at -004; Trial Tr.

900:10-901:10 (Phillips).[1]   The standard of care did not require a cesarean section at 2:45 a.m.

Thereafter, Ms. Perez's fetal monitoring strip remained Category I through 3:52 a.m., when a single isolated variable deceleration appeared.  In other words, there was no evidence of fetal oxygenation issues for at least one hour and six minutes after the isolated prolonged deceleration resolved.  And, when variable decelerations returned, the team jumped into action.  The obstetrical nurse began to reposition Ms. Perez and called in the obstetrical team.

Shortly after 4:00 a.m. further variable decelerations reappeared.  The following 32 minutes (up to the point when Ms. Perez executed the consent to a cesarean section) involved a flurry of activity.  LCDR Jenkins returned to bedside, the team repositioned Ms. Perez, Ms. Perez attempted a practice push to see if vaginal or operative delivery (forceps or vacuum) was an option, the team re-commenced IV boluses, they again administered tocolytics, and LCDR Jenkins administered an amnioinfusion.  By this time LCDR Jenkins had made a decision: the situation required prompt delivery.  By no later than 4:32 a.m., LCDR Jenkins recommended, and Ms. Perez agreed, that the means to accomplish that prompt delivery was an emergent cesarean section.[2]

Because of the foresight of the nursing staff and the Certified Nurse Midwife ("CNM"), the operating room was ready to go.  LCDR Jenkins made her skin incision at 4:57 a.m., 25 minutes after she "called" the cesarean section.  She delivered I. Perez at 5:01 a.m., 29 minutes after she "called" the cesarean section.  All within the standard of care.

Upon delivery, I. Perez had a heartbeat less than 40, was not spontaneously breathing, and required resuscitation.  NCHP transferred I. Perez to the Neonatal

---

[1]     All citations to the Trial Transcript are to the unredacted transcripts, ECF Nos. 90, 91, 92, 93, 94, 95, 96, and 97.

[2]     *See* stipulation at Trial Tr. 85:2-16; JX-113-105.

Intensive Care Unit ("NICU") at Naval Medical Center San Diego ("NMCSD") for neonatal care.  Currently, I. Perez is a five year old boy with, according to plaintiffs' expert neurologist, cortical visual impairment, profound speech and motor delay, and epilepsy.  Plaintiffs' physiatrist diagnosed I. Perez as having cerebral palsy with spastic tetraplegia.

All experts that testified at trial on the subject agreed that acute intrapartum asphyxia is not the only cause of Hypoxic Ischemic Encephalopathy ("HIE"), and that HIE is not the only cause of cerebral palsy.[3/]  In fact, ACOG and the American Academy of Pediatrics, in a 2014 consensus paper cited and relied upon by plaintiffs' neurologist, note that "[i]t is now known that there are multiple potential causal pathways that lead to cerebral palsy in term infants . . . ."  DX-L-001 (marked for identification only).  Those known causes include "genetic abnormalities, environmental and sociodemographic factors, . . . some placental abnormalities[,] . . . abruptio placentae, chorioamnionitis, and twin-twin transfusion," amongst others.  *Id.* at -002.

Infection is a potential cause of I. Perez's condition.  On December 17, 2013, NHCP doctors diagnosed Ms. Perez as having vaginitis, an infection, and, on December 23, 2013, doctors noted she was anemic.  Ms. Perez's placenta displayed corionitis, a condition caused by an infection.  A lumbar puncture of I. Perez, performed on January 7, 2014, after he had been on antibiotics, showed an elevated white blood count.  This finding, according to plaintiffs' expert neurologist, "doesn't preclude some form of mild infection."  And, while I. Perez was in the NICU, Ms. Perez developed shingles, an infection.  As explained by Dr. Dyes, the evidence does not rule out infection as a possible cause of I. Perez's injuries.

Neuroimaging studies do not support a causal connection between acute intrapartum asphyxia and I. Perez's HIE.  NMCSD performed neuroimaging studies on I.

---

[3/]    *See*, *e.g.*, plaintiffs' opening statement, "One of the causes of cerebral palsy can be lack of oxygen during labor and delivery.  It's not the only cause of cerebral palsy."  Trial Tr. 15:18-19.

Perez while he was in the NICU.  Of note, Navy radiologists interpreted a January 7, 2014, MRI study as showing "[n]o specific imaging findings to suggest significant hypoxic ischemic injury or specific metabolic process."  JX-27-002.  These findings are inconsistent with a conclusion that intrapartum asphyxia caused I. Perez's injuries.

Potential genetic causes are at play.  Comprehensive genetic testing performed in 2018 on I. Perez revealed three "variants of potential clinical relevance."  JX-126-002.  I. Perez's treating neurologist, who has treated him since birth, ordered this additional testing because a 2018 imaging study result "was somewhat surprising . . . given his clinical presentation and [history]."  JX-122-004.

As observed by ACOG and the American Academy of Pediatrics:

In the presence of other significant risk factors—such as abnormal fetal growth, *maternal infection*, fetomaternal hemorrhage, *neonatal sepsis*, and chronic placental lesions—an acute intrapartum event as the sole underlying pathogenesis of neonatal encephalopathy *becomes much less likely*.

DX-L-004 (marked for identification only) (emphasis added).

The weight of the evidence does not support a conclusion that the four hours and one minute of NHCP-managed labor, or acute intrapartum asphyxia, was the cause, or even a substantial contributing causal factor, of I. Perez's injuries.  There are other credible causes of I. Perez's presentation that the medical experts cannot rule out.

Should the Court find the United States liable, three issues predominate when calculating damages: (1) what is I. Perez's life expectancy; (2) what are the appropriate net discount rates; and (3) what level of attendant care will I. Perez's injuries necessitate when he is an adult?  On the first point, Dr. Dyes testified at trial that she based her life expectancy opinions on her extensive experience with children with cerebral palsy and published, peer-reviewed studies that looked specifically at life expectancies of children in California with cerebral palsy.  Plaintiffs' physiatrist, in contrast, based her opinions on a single sentence in an article that set forth a crude means to estimate life expectancy "which is now generally accepted in the UK legal system."  DX-P-022 (marked for

identification only).  Even then, plaintiffs' expert's modified application of that methodology is inaccurate because I. Perez now has a feeding tube.  The weight of the evidence shows that I. Perez's probable life expectancy is to age 45.

Mr. Gustafson explained at trial the generally accepted economic methodology to calculate the present value of future damages using a net discount rate.  A net discount rate has two components: inflation (or wage growth); and interest.  Mr. Gustafson explained why he selected specialized inflation rates that provide an "apples to apples" analysis for the disparate damages items at issue in this case.  He explained how applying a generalized medical inflation rate to medical procedures or services that have experienced significantly less price growth historically, and recently, is inappropriate.  He also explained, in detail, why the Consumer Price Index ("CPI") is economically a more appropriate estimate of future wage growth than historical wage growth of men and women combined, which is skewed as a result of rapidly equalizing pay between genders.

As to the appropriate interest component of any net discount rate, plaintiffs advocated (at least originally) for use of the average historical return on the 90-day Treasury Bill, while Mr. Gustafson explained that the average historical return (after tax) on the 5-year Treasury Note is more appropriate in this case.  At trial, plaintiffs' economist appeared to retract (or at least express skepticism of) his use of the 90-day Treasury Bill.  But the Court should not accept plaintiffs' attempt to change methodologies in trial.  I. Perez faces needs over the 40 years remaining in his expected lifespan.  No prudent trustee would simply invest funds earmarked for care 10, 20, 30, or 40 years in the future in rolling 90-day securities.  Even with ongoing medical expenses, I. Perez has a much longer investment horizon than 90 days, and the 5-year Treasury Note is a much more appropriate interest proxy in this case.

Finally, it was obvious to all at trial that I. Perez's parents love him very much.  To date, his parents have provided exceptional care for I. Perez.  Aside from limited in-home care provided through the State of California at no cost to the Perez family, I. Perez has never had in-home nursing care, and he certainly has never had 24/7 skilled nursing care.

Although I. Perez will require attendant care as an adult, the evidence at trial did not establish that his medical condition necessitates 24/7 in-home Licensed Vocational Nurse ("LVN") care.  Instead, the weight of the evidence demonstrates that once I. Perez is an adult (age 22) a skilled care facility would provide him with the medical care necessitated by his injuries as well as a degree of independence and opportunity.

## II.   PROPOSED FINDINGS OF FACT

### A.   Standard of Care/Breach.

1.      In December 2013, Ms. Perez was pregnant with I. Perez.  Trial Tr. 1242:20-1243:4 (Norma Perez).

2.      Prior to her pregnancy with I. Perez., Ms. Perez delivered three children vaginally.  *Id.* at 1240:14-24 (Norma Perez).

3.      On December 17, 2013, Ms. Perez presented to NHCP complaining of a "fall onto right side on Friday, less than usual fetal movement and occasional vaginal discharge."  JX-3-003.

4.      At this December 17, 2013, visit, NHCP doctors diagnosed Ms. Perez as having vaginitis.  *Id.* at -006, -008.

5.      An infection can cause vaginitis.  Trial Tr. 207:9-16 (Weiss); 906:3-8 (Phillips).

6.      On December 22, 2013, Ms. Perez again presented to NHCP.  JX-4-001.  At this visit she complained of "cramping and spotting."  *Id.*  NHCP doctors noted Ms. Perez had anemia and "[e]ncouraged [her] to pick up her prescription for Iron."  *Id.* at -005.

7.      Anemic women have less capacity to transport oxygen within the body.  Trial Tr. 208:3-8 (Weiss).

8.      Ms. Perez does not recall if she went to get additional iron pills after this visit.  *Id.* at 1292:17-19 (Norma Perez).

9.      Ms. Perez again presented to NHCP on December 31, 2013.  JX-8-001.

10.     She arrived at NHCP around 1:00 a.m.  Trial Tr. 1211:4-8 (Norma Perez).

11.     By 1:15 a.m., Ms. Perez was in triage.  JX-11-001; JX-12-001.

12.     In triage, Ms. Perez was crying due to discomfort.  Trial Tr. 988:16-18 (Manuel).

13.     Electronic fetal heart rate monitoring includes electronic monitoring of the baby's fetal heart rate as well as mom's uterine activity.  *Id.* at 888:19-889:2 (Phillips). The fetal heart rate monitoring component is sometimes referred to as "FHR" or "FHT." *Id.*

14.     In triage, NCHP staff observed variable decelerations on the fetal monitoring.  JX-23-002.

15.     According to ACOG, variable decelerations are:

•       Visually apparent abrupt decrease in FHR

•       An abrupt FHR decrease is defined as from the onset of the deceleration to the beginning of the FHR nadir of less than 30 seconds.

•       The decrease in FHR is calculated from the onset to the nadir of the deceleration.

•       The decrease in FHR is 15 beats per minute or greater, lasting 15 seconds or greater, and less than 2 minutes in duration

•       When variable decelerations are associated with uterine contractions, their onset, depth, and duration commonly vary with successive uterine contractions.

JX-91-002 (marked for identification only); *see also* Trial Tr. 817:11-819:1 (Phillips).

16.     Variable decelerations are a common experience in laboring patients.  Trial Tr. 1106:21-22 (Zebley).

17.     In triage, NHCP providers also noted accelerations, which are an indication of fetal wellbeing.  *Id.* at 1016:20-1017:3 (Manuel).

18.     The CNM admitted Ms. Perez for labor because of these variable decelerations.  *Id.* at 603:7-13 (Moran); JX-23-003.  She was admitted at 1:30 a.m.  JX-8-001; Trial Tr. 673:10-11 (Moran).

19.     At this time, Ms. Perez was "in a lot of pain," "moving around the bed quite

a bit," and "writhing around the bed in pain."  Trial Tr. 614:1-8, 15-19 (Moran).

20.    Upon admission, NHCP providers developed a management plan for Ms. Perez that included IV bolus, position changes, oxygen, and blood work to permit an epidural if wanted or necessary.  *Id.* at 677:22-678:22 (Moran).  The IV bolus, oxygen, and position changes are all intrauterine resuscitative measures intended to address variable decelerations.  *Id.*

21.    Umbilical cord compression can cause variable decelerations.  *Id.* at 725:7-11 (Miller); 819:10-14 (Phillips).  ACOG advises that IV fluid bolus, maternal repositioning, and maternal oxygen administration may resolve variable decelerations and improve fetal oxygenation during labor.  *Id.* at 726:23-727:9 (Miller).

22.    "[O]xygen, position change, fluid bolus, correct hypotension, stop or reduce uterine stimulant, consider uterine relaxant, consider amnioinfusion.  That's just a standard approach.  A lot of them were done in this case.  I think the ones that were appropriate were done."  *Id.* at 729:25-730:4 (Miller).

23.    While she was in labor, NHCP providers continuously monitored Ms. Perez's FHT.  *Id.* at 900:15-19 (Phillips).

24.    There is a lack of evidence for an improvement in birth outcomes as a result of electronic fetal monitoring.  *Id.* at 889:6-11 (Phillips).  FHT monitoring "is not 100 percent.  It's not highly specific.  It can have errors."  *Id.* 896:13-19 (Phillips).

25.    Obstetricians managing labor have to attend to both mom and baby.  *Id.* at 740:18-741:2 (Miller); *see also id.* at 892:13-20 (Phillips) ("of course" obstetrician has to attend to other aspects of patient care aside from FHT monitoring).

26.    Recurrent variable decelerations are those that occur with at least 50 percent of the contractions in a 30-minute window.  *Id.* at 719:8-11 (Miller); *see also* JX-91-003 (marked for identification only) ("*Recurrent variable decelerations*, defined as occurring with greater than or equal to 50% of contractions . . . .").

27.    Mrs. Perez did not have recurrent variable decelerations from admission through 2:45 a.m.  *Id.* at 396:4-9 (Jenkins).

28.     After admission, Ms. Perez and her baby responded to resuscitative measures.  *Id.* at 608:14-18, 658:6-15 (Moran).  By 1:59 a.m., the variable decelerations Ms. Perez experienced in triage had resolved.  *Id.* at 743:17-744:5 (Miller); JX-12-007.

29.     The CNM documented a prolonged deceleration with a nadir to 70's at 2:36 a.m.  Trial Tr. 633:4-18 (Moran); JX-5-005.  This was the first prolonged deceleration Ms. Perez experienced since arriving at NHCP.  Trial Tr. 794:25-795:5 (Miller); *see also id.* at 843:23-25 (Phillips) ("prior to this time, we had not seen anything like this").  The NHCP staff responded to that event as a prolonged deceleration.  *Id.* at 639:14-20 (Moran).  The team also called LCDR Jenkins to bedside for a consultation.  *Id.* at 660:11-14 (Moran).

30.     Nurses are trained to respond to prolonged variable decelerations with "intrauterine resuscitation, repositioning, I.V. bolus, and try to resolve the problems."  *Id.* at 1049:24-1050:4 (Zebley).  The nursing staff also alerts the provider when they observe a prolonged deceleration.  *Id.* at 1051:5-9 (Zebley).

31.     Between 2:39 a.m. and 2:41 a.m., NHCP staff repositioned Ms. Perez to right lateral and then to hands and knees, administered an IV bolus, and administered Terbutaline (a tocolytic).  JX-12-012.

32.     The resuscitative measures (IV fluids, oxygen, position changes, and Terbutaline) administered in response to the prolonged deceleration around 2:36 a.m. worked and resolved the deceleration.  Trial Tr. 684:4-25, 689:3-10 (Moran); 749:8-751:3 (Miller); 913:19-914:4 (Phillips); *see also* JX-12-012.

33.     "A prolonged deceleration that fails to resolve may well constitute an indication for a cesarean, but by itself a prolonged deceleration that does respond appropriately to conservative corrective measures and does resolve does not necessarily indicate that cesarean be on your radar at that time, as you put it."  *Id.* at 776:5-10 (Miller).

34.     LCDR Jenkins assessed Ms. Perez at 2:46 a.m.  JX-5-005.

35.     At the time LCDR Jenkins examined Ms. Perez, she noted "fetal heart

- 9 -

tracing reassuring now after intervention of maternal position change and terbutaline."
*Id.* LCDR Jenkins observed accelerations. *Id.* Dr. Phillips identified moderate
variability at this time. Trial Tr. 851:21-25 (Phillips).

36.    Moderate variability, even in the presence of decelerations, "is a feature to
the fetal heart rate tracing that reliably excludes ongoing hypoxic injury at the time." *Id.*
at 719:19-721:5 (Miller).

37.    The team's response to the perceived prolonged deceleration was
appropriate. *Id.* at 747:3-748:5 (Miller).

38.    I. Perez was oxygenated and uninjured at 2:45 a.m. *Id.* at 902:4-9 (Phillips).

39.    The standard of care did not require a cesarean section at 2:45 a.m. *Id.* at
398:18-21 (Jenkins); 686:11-17 (Moran); 748:6-17 (Miller).

40.    Ms. Perez went from four centimeters dilation in triage to seven centimeters
at approximately 2:40 a.m., indicating good progress towards vaginal delivery. *Id.* at
1022:24-1023:6 (Manuel).

41.    After the prolonged deceleration resolved, LCDR Jenkins and the CNM
collaboratively developed a management plan. *Id.* at 685:20-686:10 (Moran). That
management plan was:

1.    continue with epidural placement for pain control.

2.    anticipate vaginal delivery unless indication for cesarean occurs.

3.    discussed cesarean delivery for fetal distress if remote from delivery
(vaginally), risks/benefits/procedure of cesarean delivery (to include but not
limited to bleeding, infection, injury to internal organs, abdominal incision
to abdominal wall and uterus for delivery of baby) discussed.

4.    all above discussed with patient, her husband and provider/nursing
team.  patient expressed a clear level of understanding.

JX-5-005.

42.    There are multiple management approaches to a patient that can comply with
the standard of care. Trial Tr. 713:16-19 (Miller).

43.     Patient management requires judgment calls and clinical decisions during the course of labor.  *Id.* at 714:6-12 (Miller).

44.     From 2:46 a.m. through 3:59 a.m. there was nothing concerning on Ms. Perez's FHT monitoring.  *Id.* at 651:17-21, 656:10-14 (Moran).  Between 2:39 a.m. and 2:47 a.m. it was Category I.  *Id.* at 397:2-20 (Jenkins).

45.     There were "at least two attempts" to place an epidural between 2:47 a.m. and 3:11 a.m.  *Id.* at 1089:3-1090:7 (Zebley).

46.     When mom is sitting up for an epidural there is nothing unusual about picking up mom's heartbeat instead of baby's with an external ultrasound heart monitor. *Id.* at 795:6-21 (Miller).

47.     A fetal scalp electrode "can provide intermittent readings as well as sometimes can provide artifactual readings."  *Id.* at 739:9-17 (Miller).

48.     Between 2:55 a.m. and 3:03 a.m. Ms. Perez's FHT was Category I with moderate variability and accelerations.  *Id.* at 398:22-399:13 (Jenkins).

49.     For Category II FHT with moderate variability, ACOG recommends "Continued surveillance + Intrauterine resuscitative measures."  JX-91-004 (marked for identification only); Trial Tr. 900:10-901:10 (Phillips).

50.     Between 3:25 a.m. and 3:35 a.m. Ms. Perez's FHT was Category I.  Trial Tr. 751:4-18 (Miller).

51.     Around 3:52 a.m., Ms. Perez had a variable deceleration, and then another variable deceleration around 4:00 a.m.  JX-12-021 to -022.  The CNM described this as "variable deceleration nadir to 60 for 20 sec, return to baseline."  JX-5-003.

52.     In response to the variable deceleration at around 4:00 a.m., the team recommenced resuscitative measures and called LCDR Jenkins.  Trial Tr. 689:16-691:7 (Moran); *see also* JX-5-003 (reposition right lateral then knee-chest, IV fluids bolus, maternal oxygen).  Those resuscitative measures were appropriate.  Trial Tr. 753:9-12 (Miller).

53.     A single, isolated instance of cord compression does not necessarily present

a danger to the baby if its resolves quickly.  *Id.* at 102:15-18 (Jenkins).

54.   Around 4:00 a.m., the CNM "was asking the team to assemble the operating room to prepare for if Dr. Jenkins and the patient decided that they were going to proceed with cesarean section so that everything was smoothly ready for that to happen."  *Id.* at 643:20-644:1 (Moran).

55.   In the 4:00 a.m. hour "everybody worked together and collaboratively during the circumstances to get this -- get Ms. Perez into a C-section."  *Id.* at 1065:14-18 (Zebley).

56.   LCDR Jenkins was bedside at 4:17 a.m.  JX-12-024; JX-5-003.  A vaginal exam revealed Ms. Perez was dilated 9.5 cm.  JX-12-024.

57.   At 4:22 a.m., LCDR Jenkins attempted a practice push.  *Id.*  Because Ms. Perez was 9.5 cm dilated, a practice push could stretch the cervix and move the head through the cervix, which would allow prompt vaginal delivery.  Trial Tr. 405:18-24 (Jenkins)

58.   At 4:26 a.m., the team again administered Terbutaline.  JX-12-025.

59.   At some point between 4:17 a.m. and 4:32 a.m., LCDR Jenkins recommended a cesarean section for Ms. Perez.  Trial Tr. 96:8-12, 380:19-20 (Jenkins); JX-113-105.

60.   Ms. Perez consented to a cesarean section at 4:32 a.m.  Stipulation at Trial Tr. 85:2-16; JX-113-105.

61.   While the team prepared Ms. Perez to go to the operating room (from 4:32 a.m. through 4:38 a.m.) LCDR Jenkins started an amnioinfusion and moved mom to a Trendelenberg position to relieve cord compression.  JX-12-026; Trial Tr. 406:6-407:2 (Jenkins).

62.   The team moved Ms. Perez to the operating room around 4:40 or 4:42 a.m., LCDR Jenkins performed the skin incision at 4:57 a.m., and she delivered I. Perez at 5:01 a.m.  Trial Tr. 411:4-10 (Jenkins); JX-17-001.  This met the standard of care and "was actually rapid."  Trial Tr. 758:3-5 (Miller).

**B.    Causation**

63.    Electronic fetal monitoring cannot detect all intrapartum neurological injuries.  *Id.* at 733:12-14 (Miller).

64.    Intrapartum asphyxia is not the only cause of HIE.  *Id.* at 202:8-10 (Weiss); *see also id.* at 927:7-12 (Zeldin), 1146:2-7 (Dyes).

65.    I. Perez's venous cord blood gasses were pH 7.328, pCO$_2$ 38.2, pO$_2$ 42.9, with a calculated Base Excess of -5.7.  JX-17-001.  These results are normal.  *Id.* at 760:3-13 (Miller).

66.    At birth, I. Perez's arterial cord blood gasses were pH 6.881, with a calculated Base Excess of -16.7.  JX-17-001.

67.    "A harmless form of acidemia is respiratory acidemia; that is, an elevation in a carbon dioxide in the blood that happens when you hold your breath."  Trial Tr. 722:5-7 (Miller).  "Respiratory acidemia is extremely common and harmless."  *Id.* at 723:11-12 (Miller).

68.    The placental pathology report revealed chorionitis.  JX-24-001.

69.    An infection can cause chorionitis.  Trial Tr. 208:13-14 (Weiss).

70.    A January 7, 2014, lumbar puncture revealed a white blood cell count high for a newborn, *id.* at 206:11-12 (Weiss), which "could be" indicative of an infection, *id.* at 207:1-3 (Weiss); *see also id.* at 1148:3-22 (Dyes).  The fact that I. Perez was on antibiotics prior to his January 7, 2014, lumbar puncture and the results of that procedure "doesn't preclude some sort of mild infection."  *Id.* at 204:5-13 (Weiss).

71.    Shingles is a reactivation of a viral infection, and Ms. Perez developed shingles on, or around, January 7, 2014.  *Id.* at 201:2-12 (Weiss).

72.    Infection "can certainly cause brain injury that could look like Hypoxic-Ischemic Encephalopathy."  *Id.* at 203:4-7 (Weiss).

73.    In the presence of other significant risk factors, such as abnormal fetal growth, maternal infection, fetal/maternal hemorrhage, neonatal sepsis and chronic placental lesions, an acute intrapartum event, as the sole underlying pathogenesis of

neonatal encephalopathy becomes much less likely.  *Id.* at 211:8-15 (Weiss).

74.    On January 6, 2014, NMCSD performed a MRI on I. Perez.  Navy radiologists interpreted that MRI study as displaying "[n]o specific imaging findings to suggest significant hypoxic ischemic injury or specific metabolic process."  JX-27-002; Trial Tr. 213:8-13 (Weiss).

75.    Dr. Weiss agrees that two equally qualified pediatric neuroradiologists can develop different interpretations of the same imaging study.  Trial Tr. 213:8-17 (Weiss).  And Dr. Weiss readily admits he is not a neuroradiologist.  *Id.* 212:21-22 (Weiss).  The interpretation of the myelation patterns in the posterior limb of the internal capsule ("PLIC") is subjective.  *Id.* 214:19-21 (Weiss).  "It does take a trained neuroradiologist" to assess hyper- or hypo-intensity in the PLIC.  *Id.* at 1192:6-19 (Dyes).

76.    On December 16, 2014, NMCSD performed a follow-up MRI.  Navy radiologists interpreted that study as showing "[m]ild increased extra axial subarachnoid fluid.  A component of mild parenchymal volume loss cannot be excluded.  Otherwise negative brain MRI without other imaging findings to suggest hypoxic ischemic encephalopathy."  JX42-002.

77.    HIE is not the only cause of mild parehchymal volume loss.  Trial Tr. 977:5-8 (Zeldin).

78.    NMCSD again performed a MRI on I. Perez on May 23, 2018, which Dr. Zeldin reported "was normal."  JX-122-004.

79.    At his 3-month neurology appointment, Dr. Zeldin noted that I. Perez's head circumference was normal.  This finding was clinically significant because "[c]hildren with a history of H.I.E. will sometimes have poor head growth, and so you monitor it closely."  Trial Tr. 935:15-24 (Zeldin).  I. Perez's head circumference remained normal at age one year seven months.  *Id.* at 940:12-24 (Zeldin).

80.    Upon examination by Dr. Weiss, I. Perez's head circumference was normal.  *Id.* at 168:12-13 (Weiss).  Dr. Dyes reached the same conclusion reviewing I. Perez's medical records.  *Id.* at 1151:14-1152:1 (Dyes).  This normal head circumference growth

is not what a doctor would "see with a hypoxic-ischemic brain injury." *Id.* at 1152:2-10 (Dyes).

81.    July 2018 genetic testing of I. Perez revealed "[n]o clinically significant sequence variants or copy number changes (del/dup) were identified which can explain the primary clinical concerns for this patient.  However, 3 variants of unknown significance are reported."  JX-123-002.  The geneticists described these as "variants of potential clinical relevance."  *Id.*

82.    In addition to potential intrapartum asphyxia, Dr. Dyes identified two other potential causes of I. Perez's neonatal encephalopathy: infection; and genetics.  Trial Tr. 1147:7-1148:2 (Dyes); *see also id.* at 1155:25-1156:9, 1202:23-1203:8 (Dyes).

83.    Infection is discussed above, and with respect to genetics, the evidence does not permit Dr. Dyes to rule out genetics as a cause of I. Perez's presentation.  *Id.* at 1151:5-7 (Dyes).

**C.    Damages**

84.    I Perez's life expectancy is to a total of about 40 to 45 years.  *Id.* at 1145:1-7 (Dyes).

85.    Dr. Weiss believes I. Perez has "a lot of cognitive disability," *id.* at 161:20-162:1 (Weiss), but Dr. Pico did not apply the Barnes article's recommended five-year deduction for cognitive impairment in her life expectancy calculation, *id.* at 303:13-16, 305:19-21 (Pico).

86.    Because I. Perez now has a feeding tube, Dr. Pico's original life expectancy opinion is incorrect.  *Id.* at 199:14-200:1 (Weiss).

87.    I. Perez's brain injury is static and is not likely to worsen over time.  *Id.* at 217:21-25 (Weiss).

88.    I. Perez's injuries do not necessitate private school.  *Id.* at 1156:10-1157:11 (Dyes).

89.    I. Perez would not benefit from neuropsychological assessment.  *Id.* at 1157:23-1158:21 (Dyes).

90.    I. Perez's incontinence does not necessitate a urologist. *Id.* at 1159:21-1160:2 (Dyes).

91.    No doctor outside of the context of this litigation has ever told Ms. Perez that I. Perez will require 24/7 nursing care for his life. *Id.* at 1258:19-24 (Norma Perez).

92.    MediCal provides one hour a day of nursing care for five days a week at no cost to I. Perez. *Id.* at 1295:23-1296:3 (Norma Perez).

93.    An intermediate care residential facility could provide medically necessary care to I. Perez as an adult. *Id.* at 218:1-5 (Weiss); 298:8-10, 330:12-13 (Pico).

94.    Ms. Hyland did not include in her analysis the amounts providers accept as payment in full from MediCal or TRICARE. *Id.* at 466:4-8, 475:22-477:16 (Hyland).

95.    From on and before December 31, 2013, and subsequent thereto, Norma Perez and I. Perez were dependents of Israel Perez entitled to receive medical care from the United States through TRICARE, including at military healthcare facilities. Stipulated Fact 5, Final Pretrial Order 10, ECF No. 55.

96.    Dr. Zeldin (a Navy doctor) has been I. Perez's neurologist for his whole life. Trial Tr. 951:12-19 (Zeldin).

97.    "The Regional Center is a state and federally funded agency in California that provides case management and therapy, or will fund therapies in some instances for children and adults with -- who are at risk for developmental disabilities or who have developmental disabilities." *Id.* at 946:5-10 (Zeldin).

98.    I. Perez receives physical and occupational therapy through California Children's Services ("CCS") at no cost. *Id.* at 297:10-18 (Pico).

99.    In her life care plan, Ms. Hyland estimates the cost of summer camps for I. Perez, *id.* at 453:11-18 (Hyland), while Dr. Pico testified, "There is camps for children with disabilities.  A lot of times there isn't a charge for those necessarily.  They can be free," *id.* at 281:16-282:2 (Pico).

100.    MediCal publishes payment schedules, *id.* at 469:18-19, 473:3-7 (Hyland), but Ms. Hyland did not use MediCal rates in her life care plan, *id.* 466:4-8 (Hyland).

101.   Between 1980 and 2015, male real wages only grew by 0.4%.  *Id.* at 1352:7-1353:11 (Gustaftson).  During the same period, women's real wages grew by 32.8%.  *Id.* Mr. Johnson erred by combining the average wage for males (appropriate) and the combined wage growth for both males and females (inappropriate).  *Id.* at 1355:7-1356:3 (Gustafson).

102.   Mr. Johnson did not identify anything particular about I. Perez that suggests he would have likely received wage increases by reason of his increased productivity, or for any other reason.  *Id.* at 568:6-569:3 (Johnson).

103.   Only 32.5% of people in the country obtain a Bachelor's degree.  Only 12% of the population obtains a Master's degree.  *Id.* at 1339:24-1340:11 (Gustafson).

104.   The appropriate net discount rate for lost earning capacity damages is 1.57%.  *Id.* at 1356:4-9 (Gustafson).

105.   I. Perez's lost earning capacity damages are $1,986,344, in present value. *Id.* at 1337:15-19 (Gustafson).

106.   A net discount rate compares interest and inflation or wage growth.  *Id.* at 553:21-554:5 (Johnson).

107.   For the interest component of his net discount rate, Mr. Johnson used the historical average return on 90-day Treasury Bills.  *Id.* at 555:1-3 (Johnson).  Mr. Johnson admitted that his use of the historical return on the 90-day Treasury Bill "is not my current assumption as of 2018."  *Id.* at 563:6-12 (Johnson).

108.   None of the three net discount rates developed by Mr. Johnson are between 1% and 3%.  *Id.* at 565:5-10 (Johnson).

109.   When evaluating one specific item in the life care plan, a van, Mr. Johnson elected to use a specialized, higher, inflation rate "simply because the growth rate for automobiles have been greater over the last 50 years . . .," *id.* at 580:7-19 (Johnson), but he refused to break out individual medical expenses for specific interest rates even though the Economic Report of the President concluded "prices of health care goods and services have risen at an annual rate of 1.7 percent, far below the 3.2 percent annual rate

seen over the preceding decade, and even farther below the 5.4 percent annual rate over the preceding 50 years," *id.* 578:7-23 (Johnson).

110.   Because items in plaintiffs' life care plan do not have similar historical inflation rates, it is inappropriate to use a general "Medical CPI" (or MCPI), and instead more appropriate to use different Bureau of Labor Statistics series tailored to the particular aspects of the life care plan.  *Id.* at 1359:1-17, 1361:19-1362:18 (Gustafson).

111.   The appropriate net discount rates for items in plaintiffs' life care plan range from -0.25% to 1.58%.  *Id.* at 1363:23-1364:7 (Gustafson).

112.   I. Perez has received and remains eligible for Supplemental Security Income ("SSI") payments.  JX-64; JX-67.

113.   The United States is entitled to a $116,000 offset for past and future SSI payments.  Trial Tr. at 1365:2-8 (Gustafson).

114.   At a minimum, the United States is entitled to a $12,957.55 offset for past SSI payments.  JX067-001 to -002.

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   Standard of Care/Breach

1.   In this Federal Tort Claims Act ("FTCA") case, the Court assesses the United States' liability "in the same manner and to the same extent as a private individual under like circumstances, but [the United States] shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  Because the events at issue in this case occurred in California, California law applies.  *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006).

2.   To establish negligence, plaintiffs must prove, by a preponderance of the evidence, "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage."  *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015).

3.   In this case, plaintiffs must establish through expert opinion testimony "the

applicable standard of care, whether that standard was met or breached by the defendant, and whether any negligence by the defendant caused plaintiff's damages." *Scott v. Rayher*, 185 Cal. App. 4th 1535, 1542 (2010).

4.     The standard of care did not require a cesarean section at 2:45 a.m.

5.     LCDR Jenkins's plan, documented at 3:03 a.m., to proceed with labor towards vaginal delivery, while continuing to monitor the baby for "indication for cesarean," JX-5-005, complied with ACOG guidelines and was appropriate under the circumstances because Ms. Perez's prolonged variable deceleration resolved with intervention and the fetal monitoring strip displayed moderate variability.

6.     Plaintiffs' alternative standard of care opinion, that the standard of care required a cesarean section "at 0245 and from that point forward," and that there was a continuous breach after 2:45 a.m. also fails.  A finding that the standard of care required a cesarean section at 2:45 a.m. underpins this continuing breach theory.  Trial Tr. 858:23-859:4, 860:24-861:4, 861:14-20, 862:15-22, 866:18-2, 869:11-14, 876:14-17, 876:21-24, 884:25-885:12, 887:14-19, 907:18-908:1 (Phillips).  Because the standard of care did not require a cesarean section at 2:45 a.m., there was no continuing obligation to perform a cesarean section.

7.     NHCP providers met the standard of care in responding to the variable decelerations that appeared in the 4:00 a.m. hour.  LCDR Jenkins's decision to call a cesarean section by no later than 4:32 a.m. met the standard of care.

8.     Incision at 4:57 a.m. and delivery of I. Perez at 5:01 a.m. complied with the standard of care.

**B.    Causation**

9.     Plaintiffs bear the burden of proof on causation in this medical malpractice action.  *Espinosa v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304, 1314-15 (1995).  To meet their burden, plaintiffs must introduce expert opinion testimony showing "that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." *Id.* (citation omitted).  "That there is a

distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion.  There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease." *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 403 (1985).  Plaintiffs' claims fail if the most they can prove through expert opinion testimony is that the alleged negligence "was a possibility, not a reasonable medical probability" as to cause.  *Miranda v. Bomel Const. Co.*, 187 Cal. App. 4th 1326, 1336 (2010).

10.    Plaintiffs failed to carry their burden of proof on causation.  While it is possible intrapartum asphyxia can cause HIE, the expert opinion testimony does not permit exclusion, through a classic differential diagnosis or "differential etiology," of other equally probable causes of I. Perez's injury.  Those other equally probable causes are infection, genetics, and idiopathy.

**C.    Damages**

11.    Plaintiffs bear "the burden of proving by a preponderance of the evidence both the existence and the amount of damages proximately caused by the defendant's tortious acts or omissions." *Pulte Home Corp. v. Am. Safety Indem. Co.*, 14 Cal. App. 5th 1086, 1127-28 (Cal. App. 2017) (citation omitted).

12.    "The burden of proof is upon the party claiming damages to prove that he has suffered damage and to prove the elements thereof with reasonable certainty." *Peters v. Lines*, 275 F.2d 919, 930 (9th Cir. 1960).  "[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (1963).

**1.    Past economic damages.**

12.    Plaintiffs presented no evidence at trial of past medical care expenses or other out-of-pocket expenses resulting from the injury.

13.    Plaintiffs claim as damages the reasonable value of extraordinary parental care necessitated by I. Perez's injury.  *Hanif v. Hous. Auth.*, 200 Cal. App. 3d 635, 644 (1988).  Although plaintiffs' solicited an estimate from Ms. Perez that she expended

3,900 hours of care on I. Perez from birth to present, Trial Tr. 1289:11-1290:4 (Norma Perez), plaintiffs presented no evidence (expert or otherwise) as to "the amount for which reasonably competent nursing and attendance by others could have been obtained," *Hanif*, 200 Cal. App. 3d at 644 (citations omitted).  Because plaintiffs failed to quantify, and failed to provide the Court with a means to quantify, these damages, plaintiffs failed to establish entitlement to past economic damages.

### 2.    Future economic damages.

#### a.    Net discount rates.

14.    In *Pfeifer v. Jones & Laughlin Steel Corporation*, the Supreme Court discussed a net discount rate approach to calculating future damages.  462 U.S. 523, 533-38 (1983).  Courts in the Ninth Circuit, including this Court, have repeatedly applied *Pfeifer*'s teachings to calculating future damages in FTCA cases.  *See*, *e.g.*, *Scott v. United States*, 884 F.2d 1280, 1286 (9th Cir. 1989); *Colleen v. United States*, 843 F.2d 329, 332 (9th Cir. 1987); *Trevino v. United States*, 804 F.2d 1512, 1517 (9th Cir. 1986); *Shaw v. United States*, 741 F.2d 1202, 1204 n.1 (9th Cir. 1984); *Veasley v. United States*, 201 F. Supp. 3d 1190, 1215 (S.D. Cal. 2016); *Walden v. United States*, 31 F. Supp. 2d 1230, 1236 (S.D. Cal. 1998).

15.    A net discount rate compares interest with inflation (or wage growth).

16.    A net discount rate between 1% and 3% is presumptively valid, *Pfeifer*, 462 U.S. at 549, and if a court employs rates outside this range they must be "[s]upported by credible expert testimony."  *Trevino*, 804 F.2d at 1519.

17.    None of Mr. Johnson's net discount rates are between 1% and 3%, and plaintiffs fail to justify use of Mr. Johnson's net discount rates.

18.    It is appropriate to consider the effect of taxes in net discount rates so long as taxes are applied to both the inflation and interest elements.  *Id.* at 1520; *Canavin v. Pac. Sw. Airlines*, 148 Cal. App. 3d 512, 520-24 (1983).

19.    The appropriate net discount rate for lost earning capacity damages is 1.57% and the appropriate net discount rates for future care items are between -0.25% and

1.58%, depending on the specific care item valued.

### b.  Lost earning capacity.

20.  I. Perez's most likely level of educational attainment but for his injury is a Bachelor's degree.  A court should not use wage growth as the inflation component for a lost earning capacity net discount rate.  *Trevino*, 804 F.2d at 1518-19; *McCarthy v. United States*, 870 F.2d 1499, 1503 (9th Cir. 1989).  Instead, CPI is the appropriate inflation rate.  *Id.*

21.  I. Perez's lost earning capacity damages are $1,986,344, in present value.

22.  The FTCA entitles the United States to a judgment reasonably approximating California's periodic payment statute, CAL. CIV. PROC. CODE § 667.7, for these damages.  *Cibula v. United States*, 664 F.3d 428, 436 (4th Cir. 2012); *Dutra v. United States*, 478 F.3d 1090, 1092 (9th Cir. 2007).  After deducting costs and fees, the parties shall confer and agree upon a fixed schedule of the "dollar amount of the payments." CAL. CIV. PROC. CODE § 667.7(b)(1).  This schedule shall commence payment in 2036 and shall use an inflation (wage growth) rate of 3.54%.

### c.  Future medical expenses.

23.  Plaintiffs in personal injury actions may only recover "the reasonable cost of reasonably *necessary* medical care that [the plaintiff] is reasonably *certain* to need in the future." CACI 3903A (emphasis added).  Accordingly, plaintiffs must tie claimed future care to the underlying injury, and may not recover future medical care damages simply because the parents want that care or an expert opines that care may be "better" than alternative "reasonably necessary" care.

24.  I. Perez is insured.  Accordingly, "the 'full bill' for past medical services is not relevant to prove past or future medical expenses and/or noneconomic damages." *Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1269 (2018).  There is a limited exception to this rule where an insured plaintiff has chosen to treat outside his insurance plan (*e.g.*, on a lien).  *Id*.  I. Perez does not qualify for this exception.

25.  TRICARE provides insurance coverage for medical care outside of military

healthcare facilities.  32 C.F.R. § 199.6; *see also* Trial Tr. 1296:4-6 (Norma Perez) (TRICARE paid for birth of youngest daughter at non-military hospital).  The Department of Defense's Defense Health Agency "is responsible for the management and operation of the TRICARE program to ensure that military health and private sector care services provide service to the beneficiaries. . .  As part of the TRICARE program, beneficiaries are able to obtain authorized care from civilian providers through Managed Care Support Contracts ('MCSCs') for which they are reimbursed."  *OST, Inc. v. United States*, 140 Fed. Cl. 662, 664 (2018).

26.    There was no evidence at trial that I. Perez has agreed (though a lien agreement or otherwise) to obtain medical care from a facility or providers that are not eligible for TRICARE reimbursement.

27.    Ms. Hyland did not attempt to ascertain what any healthcare providers in her life care plan would accept as payment in full from TRICARE or Medi-Cal.  Ms. Hyland's life care plan uses the "full bill" in its calculations.  Accordingly, plaintiffs failed to present admissible evidence establishing future medical care damages and are entitled to no such damages.

### d.    Other future care items.

28.    I. Perez's injuries do not "reasonabl[y] necess[itate]," CACI 3903A, private school.

29.    I. Perez's injuries do not "reasonabl[y] necess[itate]," *id.*, 24/7 LVN care when he is an adult.

30.    Plaintiffs have failed to show the true out-of-pocket cost of summer camps, should I. Perez attend such camps.

31.    I. Perez may recover future care damages for the following items in Ms. Hyland's life care plan: Section I.P (assistive technology); Section I.Q (conservator/fiduciary); Section I.R (applied behavior analysis); Section III.A (manual wheelchair); Section III.B (augmentive communication); Section III.C (computer system); Section III.D (orthotics); Section III.E (miscellaneous equipment); Section IV.A

(educational advocate); Section IV.B (educational therapist); Section IV.D (day activity program); Section V.A (van); Section VI.B (facility care); and Section VII.A (housing modification).

32.     Mr. Gustafson shall calculate the present value of the foregoing items using the corresponding net discount rate for each item.  The FTCA entitles the United States to a judgment reasonably approximating California's periodic payment statute for these damages.  After deducting costs and fees, the parties shall confer and agree upon a fixed schedule of the "dollar amount of periodic payments."  This schedule shall use the appropriate inflation rate associated with each item as identified by Mr. Gustafson.

### 3.     Non-economic damages.

33.     CAL. CIV. CODE § 3333.2 establishes a cap of $250,000 in non-economic damages in medical malpractice actions, and this cap applies in this FTCA action.  *Taylor v. United States*, 821 F.2d 1428, 1430 (9th Cir. 1987).

34.     This cap applies per action, not per plaintiff.  *Yates v. Pollock*, 194 Cal. App. 3d 195, 199 (1987).

35.     Plaintiffs Norma Perez and I. Perez can recover no more than $250,000 in non-economic damages combined.

### 4.     Offset.

36.     The United States is entitled to an offset for I. Perez's SSI Social Security payments because I. Perez has never, and will never, pay into this program.  *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 931 (9th Cir. 1992).  The United States is entitled to an offset of $116,000.

## IV.   ARGUMENT

For the reasons stated above, the Court should enter judgment in favor of the United States.  In this section, the United States addresses in greater detail certain issues that arose at trial.

### A.    The United States Did Not Breach the Standard of Care.

"Reasonable care will vary under the circumstances of each case [and] . . . Courts

- 24 -

and juries should be cautioned to avoid judging liability based on hindsight." *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 634 (2018).  Moreover, it is axiomatic that "[m]edicine partakes of art as well as science." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014).  Thus, when assessing whether the United States breached the standard of care, the Court should assess its conduct *ex ante*, or forward looking.  Plaintiffs' breach evidence, provided by Dr. Phillips, incorrectly works backwards from a result (HIE) to try to find some explanatory wrongdoing.  This reasoning is incorrect, and the Court should reject plaintiffs' breach argument.

California law acknowledges that the practice of medicine involves the exercise of judgment and choice, and that a range of patient management approaches comply with the standard of care.  CACI 505.  "[A] medical practitioner who has employed a medically acceptable method cannot be found negligent merely because there is evidence another treatment method would have been a better choice." *Meier v. Ross General Hosp.*, 69 Cal. 2d 420, 435 (1968).  "Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient." *Huffman v. Lindquist*, 37 Cal.2d 465, 475 (1951).  "A doctor is not a warrantor of cures nor is he required to guarantee results . . . ." *Sanchez v. Rodriguez*, 226 Cal. App. 2d 439, 449 (1964).

FHT monitoring is a crude and ineffective tool.  It "is not 100 percent.  It's not highly specific.  It can have errors."  Trial Tr. 896:13-19 (Phillips).  What FHT monitoring can do, and the only thing that it can scientifically do, is reliably exclude ongoing hypoxic injury at the time of observation.  *Id.* at 719:22-721:5, 750:19-751:3 (Miller).  As noted in the medical literature, "[i]nterpretation and management of fetal heart rate (FHR) patterns during labor remains one of the most problematic issues in obstetrics."  JX-92-001 (marked for identification only).

Despite the accepted scientific infirmities of electronic fetal monitoring, an inordinate amount of plaintiffs' breach presentation focused exclusively on hindsight

evaluation of these "squiggly" lines.  Trial Tr. 20:9-10 (plaintiffs' opening statement).  At trial, plaintiffs asked their expert to circle and discussed at length minor (and at times almost indiscernible) differences between "thick, dark and light gray" lines, *id.* at 841:4 (Phillips), on the approximately three and one half hours of fetal monitoring at issue. This hindsight obsession with subjective interpretations of FHT patterns fails to provide the correct context for evaluating whether there was a breach of the standard of care in this case.

When evaluating breach, the Court should look to what "other reasonably and careful" providers would know and do, CACI 501, not the personal views of what Dr. Phillips would have done in hindsight.  Luckily, in this case, this is a fairly straightforward task.

ACOG publishes practice bulletins, available to all doctors, with management guidelines.  Trial Tr. 715:7-15 (Miller); 899:20-900:9 (Phillips) (admitting ACOG publishes a management algorithm).  While these practice guidelines are flexible, and doctors have to make decisions based upon the specific circumstance presented, they provide the best evidence for this Court as to the applicable standard of care.

Ms. Perez presented with variable decelerations.  They were not recurrent variable decelerations.  Proposed Finding of Fact ("PFF") 26.  Thus, ACOG states:

> *Intermittent variable decelerations*, defined as occurring with less than 50% of contractions, are the most common FHR abnormality occurring during labor, most often do not require any treatment, and are associated with normal perinatal outcomes.

JX-91-003 (marked for identification only) (endnotes omitted).

Variable decelerations do not require cesarean delivery.  Even Dr. Phillips has to agree with that assessment, because he does not allege any breach of the standard of care before 2:45 a.m.  Moreover, even if Ms. Perez had presented with recurrent variable declerations, the standard of care still did not require cesarean delivery.  As stated by ACOG:

Evaluation of recurrent variable decelerations includes their frequency, depth and duration, uterine contraction patterns, and other FHR characteristics such as FHR variability. . . .  In FHR tracings with recurrent variable decelerations, the presence of moderate FHR variability or a spontaneous or induced acceleration suggests that the fetus is not currently acidemic.

*Id.*

Ms. Perez had both moderate variability and accelerations from admission through 2:45 a.m.  JX-23-002 (noting accelerations in triage); JX-5-005 (Assessment #1 noting accelerations and moderate variability); Trial Tr. 826:8-17 (Phillips) (Dr. Phillips noting "periods of time where there is moderate variability" when discussing JX-11-003).  As such, ACOG guidelines do not indicate cesarean delivery even if Ms. Perez's variable decelerations on admission had been recurrent.  PFF 49.  Ms. Perez's variable decelerations in triage and after admission did not require cesarean delivery.

ACOG provides guidance on interventions for variable decelerations:

Initiate lateral positioning (either left or right)

Administer maternal oxygen administration

Administer intravenous fluid bolus

Reduce uterine contraction frequency

Discontinue oxytocin or cervical ripening agents

Administer tocolytic medication (eg, terbutaline)

JX-91-005 (marked for identification only) (Table 2); *accord* PFF 21, 22.

NHCP performed these recommended intrauterine resuscitative measures on Ms. Perez.  PFF 20-22.  In other words, NHCP managed Ms. Perez's labor "by the book."  And it worked.  PFF 28.

ACOG also provides guidance regarding prolonged variable decelerations, such as the one experienced by Ms. Perez at 2:36 a.m.:

Prolonged decelerations . . . should be evaluated for identifiable causes such

as maternal hypotension (eg, postepidural), umbilical cord prolapse or occlusion, rapid fetal descent, tachysystole, placental abruption, or uterine rupture.

\* \* \* \*

Treatment for Category II tracing with . . . prolonged decelerations is directed at the underlying cause (Table 2). Fetal heart rate variability during baseline periods should be evaluated in order to better assess the risk of fetal acidemia. If . . . prolonged decelerations . . . do not resolve, then prompt delivery is recommended.

JX-91-005 (marked for identification only) (endnotes omitted).

There is no dispute that Ms. Perez's prolonged deceleration resolved. PFF 32. Accordingly, there is no basis in the literature for Dr. Phillips's opinion that the single prolonged deceleration at 2:36 a.m., which resolved with position changes and terbutaline, *required* a cesarean delivery. No reasonable obstetrician, informed by published, generally-accepted ACOG management guidance, would have believed that the only management option for Ms. Perez at 2:45 a.m. was cesarean delivery.

Certainly an elective cesarean delivery was an option at 2:45 a.m. LCDR Jenkins discussed this option with Ms. Perez. JX-5-004 (Assessment #3). But, again, "a medical practitioner who has employed a medically acceptable method cannot be found negligent merely because there is evidence another treatment method would have been a better choice." *Meier*, 69 Cal. 2d at 435. And the literature recommended continued observation and progress towards vaginal delivery after 2:45 a.m. PFF 49. LCDR Jenkins managed Ms. Perez's labor "by the book."

There is also no dispute that Ms. Perez's FHT returned to Category I after 2:45 a.m. PFF 35, 38, 44, 48, 50. As such, neither the facts nor the medical literature support Dr. Phillips's opinion that the standard of care mandated a continuing obligation to perform a cesarean delivery after 2:45 a.m.

When Ms. Perez's FHT returned to Category II around 4:00 a.m., the medical

literature instructs obstetricians to recommence intrauterine resuscitative measures (which NHCP did) and to look to variability.  As stated by ACOG:

> In FHR tracings with recurrent variable decelerations, the presence of *moderate FHR variability* or a spontaneous or induced acceleration suggests that the fetus is not currently acidemic.

JX-91-003 (marked for identification only) (emphasis added).

> As stated by Dr. Clark and his co-authors:
>
> However, the literature is consistent in its demonstration that for any individual fetus, *baseline variability* and accelerations will be reliably depressed before the pH has reached a level of acidemia associated with neurologic injury for the fetus regardless of its quantitative value.
>
> * * * *
>
> We accept the accuracy of data concluding that FHR *variability* must be absent to reliably reflect a high degree of correlation with severe fetal acidemia.

JX92-003, -006 (marked for identification only) (emphasis added).

Perhaps realizing that the medical literature does not support Dr. Phillips's opinions, plaintiffs made much of a 2012 article by Dr. Cahill and others.  But the Cahill paper does not stand for the proposition that FHT variability is not indicative of fetal oxygenation and wellbeing.  First, Cahill does not provide a management algorithm.  *See generally* JX-94.  This is in contrast to ACOG Practice Bulletin 116, Trial Tr. 900:209 (Phillips), and Dr. Clark's article, *id.* 713:3-7 (Miller).  LCDR Jenkins could not "follow" Cahill.

Second, it is telling that Dr. Phillips cherry-picks what he chooses to believe or not believe from the Cahill paper.  *Id.* at 914:5-15 (Phillips).  Third, and importantly, Ms. Perez would have been excluded from the Cahill study.  Trial Tr. 916:12-14 (Phillips).  As explained by Dr. Cahill:

> It is also important to remember that the EFM analyzed in this study was the

30 minutes prior to delivery [and] . . . we *cannot draw conclusions about the association and predictive features earlier in labor* and acidemia at birth. JX-94-008 (marked for identification only) (emphasis added).

While Cahill provides an important data point for the medical community's continuing assessment of electronic fetal monitoring, which "is ubiquitous in obstetrics, despite lack of evidence for improvement in birth outcomes and its substantial contribution to the rise in the national cesarean delivery rate," *id.* at -001, it does not provide guidance to an obstetrician such as LCDR Jenkins as to the management of a patient like Ms. Perez.  ACOG published Practice Bulletin 116 in 2010 and reaffirmed it in 2013, a year after the Cahill study was published.  JX-91-001.  Dr. Clark published his paper in 2013, JX-92-001, after the Cahill study, yet still recommended obstetricians heed variability.  Cahill did not change management practices or the standard of care.

There is no basis in the facts of this case or in the medical literature to support Dr. Phillips's opinion that the standard of care required cesarean delivery of I. Perez at 2:45 a.m.  NHCP appropriately managed Ms. Perez's labor.  They responded appropriately to the variable decelerations observed in triage.  They responded appropriately to the prolonged deceleration at 2:36 a.m.  They responded appropriately to the variable decelerations that began around 4:00 a.m., and they made a decision to proceed with an emergent cesarean delivery by no later than 4:32 a.m.  They promptly delivered I. Perez 29 minutes later, at 5:01 a.m.  All within the standard of care.

## B.     Plaintiffs' Life Care Plan is Flawed.

If the United States is liable, I. Perez should recover the "the *reasonable cost* of reasonably *necessary* medical care that [the plaintiff] is reasonably *certain* to need in the future."  CACI 3903A (emphasis added).  "[R]easonably certain to need in the future" means medically necessary.  It does not mean all possible care without regard to necessity or therapeutic benefit.  Testimony from Dr. Pico and questioning from plaintiffs' counsel calls into question whether Dr. Pico employed the appropriate standard in developing her life care plan.  On cross-examination, Dr. Pico failed to grasp any

distinction between the best possible care and medically necessary care:

> Q.     Did you feel it was your task in this case to identify the best possible
>
> care [I. Perez] could receive going forward?
>
> A.     Within reason, yes.
>
> * * * *
>
> Q.     Is there a difference in your mind between the best possible care and
>
> medically necessary care?
>
> A.     There is -- the best possible care and medically necessary care, I don't
>
> know how to answer that.

Trial Tr. 307:4-6, 307:13-16 (Pico).

With respect to items like private occupational, physical, and speech therapy, and private school, plaintiffs focus was on an idealized "better," not on medical necessity:

> Q.     Based on your clinical practice and experience in treating cerebral
>
> palsy patients, children, in both those settings over a number of years, have
>
> you been able to form an assessment as to who does *better* -- in terms of
>
> function and their overall progress, *who does better*, children in public
>
> school or children in a private school setting?
>
> A.     Children in the private school setting; in addition, children with
>
> private physical therapy.

*Id.* at 276:3-10 (Pico) (emphasis added).

Plaintiffs' counsel's disregard of the legal standard of medical necessity also came through in his questioning of Ms. Perez:

> Q.     Now if you did have an option, *and money were not an issue*, would
>
> you want to continue with [I. Perez's] health care in the Naval Medical
>
> system?
>
> A.     No.

*Id.* at 1273:7-10 (Norma Perez) (emphasis added), and:

> Q.     Given that you like Dr. Zeldin, why is it you want out of TRICARE *if*

1  *money is not an issue?*

2  *Id.* at 1302:11-13 (Norma Perez) (emphasis added).

3        In evaluating Dr. Pico's life care plan, the Court should be mindful of the

4  distinction between what is medically necessitated by I. Perez's injuries and items added

5  to the plan because they present a possibility of better or "above and beyond" care (and

6  thus increase plaintiffs' damages claims).

7        Additionally, as discussed above, plaintiffs, through Ms. Hyland, failed to properly

8  value future medical care items in Dr. Pico's life care plan.  Because I. Perez is insured

9  and insurable, PFF 95, "the 'full bill' for past medical services is not relevant to prove

10  past or future medical expenses and/or noneconomic damages."  *Pebley*, 22 Cal. App. 5th

11  at 1269; *accord Markow v. Rosner*, 3 Cal. App. 5th 1027, 1050 (2016); *Corenbaum v.*

12  *Lampkin*, 215 Cal. App. 4th 1308, 1330-31 (2013).  An award of future medical expenses

13  based upon Ms. Hyland's analysis would be reversible error.

14        **C.    Application of California's Periodic Payment Statute.**

15        As discussed in detail in the United States' pretrial brief, ECF No. 59, the FTCA

16  entitles the United States to a judgment that reasonably approximates California's

17  periodic payment statute.  Plaintiffs made certain assertions regarding application of the

18  statute in briefing, Plaintiffs' Response to United States' Pretrial Brief Re: Election

19  Under CA Code of Civil procedure Section 667.7, ECF No. 69, and at trial, Trial Tr.

20  53:1-54:5 (plaintiffs' opening statement), that are inaccurate.  Application of the statute

21  to this case is discussed below.

22        **1.    The statute does not require "gross value" evidence.**

23        California's periodic payment statute requires the Court to set forth in its

24  judgment: "[1] the recipient or recipients of the payments, [2] the dollar amount of the

25  payments, [3] the interval between payments, and [3] the number of payments or the

26  period of time over which payments shall be made."  CAL. CIV. PROC. CODE §

27  667.7(b)(1).  Nowhere does the statute mention, define, or discuss "gross value."

28  Notably, contrary to plaintiffs' and Mr. Johnson's assertions, Trial Tr. 513:24-514:2

(Johnson), the statute does not include "gross value" in its definition of "future damages." CAL. CIV. PROC. CODE § 667.7(e)(1).  The relevant evidence in a FTCA case is the present value of future damages and the inflation rates for elements of future damages. The "entire gross value," or "whole number," Trial Tr. 576:6-21 (Johnson), presented by Mr. Johnson has no relevance in this case.

The Court can only order the United States to pay the present value of damages in this FTCA case.  *United States v. English*, 521 F.2d 63, 71 (9th Cir. 1975).[4/]  Other courts have confirmed that the appropriate way to approximate California's periodic payment statute in an FTCA case is to order the United States to pay the present value and to use that amount to fund future damages.  In *Cibula*, the United States Court of Appeals for the Fourth Circuit (applying California law) determined that although ordering the United States to pay a "lump-sum, present-value judgment" to fund future damages does not duplicate CAL. CIV. PROC. CODE § 667.7, "it does sufficiently approximate" it.  664 F.3d at 435.  The Fourth Circuit explained that the present value damages found by the district court is the amount that would be sufficient, if invested conservatively, to provide for all of the plaintiff's future damages during his lifetime.  *Id.*

Like plaintiffs here, the plaintiffs in *Cibula* argued that the United States should pay the gross future care costs for periodicized damages, rather than the present value damages actually awarded by the district court.  *Id.* at 434.  The Fourth Circuit rejected this argument because by requiring the United States to pay the entire present value award up front in a lump sum to an interest-bearing account, the plaintiff would enjoy the anticipated investment benefit inherent in a present value calculation over the life of the award.  *Id.*  In reaching this conclusion, the Fourth Circuit relied on *Salgado v. Cty. of Los Angeles*, 19 Cal. 4th 629, 642 (1998).  *Cibula* 664 F.3d at 434.

District Courts in California uniformly order the United States to pay the present

---

[4/]    If this were a state court case tried to a jury the parties would present evidence of the future value of care and may, or may not, ask the jury to present value those damages.

value of future damages when approximating California's periodic payment statute.  In *I.P. v. United States*, the United States District Court for the Eastern District of California concluded that remedies crafted to approximate the statute in an FTCA suit "involve the United States satisfying a judgment with a lump-sum present-value payment."  No. 2:13-CV-01012-JAM-CKD, 2015 WL 8036075, at *1 (E.D. Cal. Dec. 7, 2015) (unpublished).  Perhaps more pertinently, Judge Hayes in a recent FTCA birth injury case ordered the United States to pay the present value of plaintiffs' future medical care damages.  Judgment, ECF No. 133 in *Veasley v. United States*, No. 3:12-cv-3053-WQH-WVG (S.D. Cal. Feb, 8, 2017).

Thus, in this case, the relevant and admissible evidence of future damages is the present value of those damages, not the "entire gross value" of all future damages combined.  Plaintiffs' argument to the contrary is incorrect.

That being said, plaintiffs are correct, and the United States has never disputed, that the "the dollar amount of the payments," Cal. Civ. Proc. Code § 667.7(b)(1), should be in future value in the Court's payment schedule.  But no party presented these numbers, not even Mr. Johnson, Trial Tr. 575:20-576:21 (Johnson), because the Court will calculate them for inclusion in its judgment.  The fundamental goal of California's periodic payment statute is "to ensure that money paid to an injured plaintiff will in fact be available when the plaintiff incurs the anticipated expenses or losses in the future." *Am. Bank & Trust Co. v. Cmty. Hosp.*, 36 Cal.3d 359, 369 (1984).  As such, the Court must first make findings of fact as to the specific future damages and when they will occur.

After the Court makes findings "on the determinables (e.g. the amount of earning capacity loss per year, the number of years, etc.)," *Schiernbeck v. Haight*, 7 Cal. App. 4th 869, 877 (1992), it can then prepare the schedule of payments called for in the periodic payment statute.  Thus it was wholly appropriate for both parties in this case to present "evidence of compounding or discounting factors, including how to calculate an appropriate rate of return throughout the relevant years."  *Id.* at 876.

An example illustrates this point.  Assume that the Court determines I. Perez is entitled to the cost of facility care when he is age 23.  Permitting one day of rounding on his birthday and assuming payment for the full year of facility care is due at the beginning of the year, I. Perez will incur those damages on January 1, 2037.  Mr. Johnson's "entire gross value," Trial Tr. 576:6-11 (Johnson), of $50,143,799 for Scenario 2 (public school and facility care) provides the Court with no relevant information to include that damage item in a periodic payment schedule.  Similarly, Ms. Hyland's $90,297.11 annual cost of facility care is equally irrelevant, because that represents the 2018 cost and neither party maintains that facility care will cost the same in 2037.

Thus, to include facility care at age 23 (in this hypothetical) in a judgment, the Court would take $90,297.11 (present value) and convert it to 2037 future value using the inflation component of the net discount rate it believes is appropriate.  Same for 2038, 2039, and each year through its determined life expectancy of I. Perez.  The parties' experts can easily make these calculations for the Court.

The bottom line is that the Court's judgment must include the present value of future damages.  That is the amount the United States owes.  The judgment must then include a schedule of payments for future damage items, expressed in future value.  The present value payment, properly invested, will make the future value payments because the lump-sum will earn interest based upon the interest component of the Court's selected net discount rate and prices will rise at a rate consistent with the inflation value of the Court's selected net discount rate.

### 2.    Form of judgment.

To approximate California's periodic payment statute, the Court should make specific findings as to past economic damages, life expectancy, lost earning capacity damages, recoverable future care items in Dr. Pico's life care plan, the present value of future damages, the net discount rates for future damages (lost earning capacity, future medical care, future non-medical care), and non-economic damages.  It should then deduct from the present value judgment the United States' offset for SSI payments.  Then

the Court should determine plaintiffs' attorney fees, not to exceed 25% of the judgment. 28 U.S.C. § 2678.

The Court should order attorney fees paid from categories of damages until exhausted in this order: non-economic damages; past economic damages; lost earning capacity damages; then future care damages. *Nguyen v. Los Angeles Cty. Harbor/UCLA Med. Ctr.*, 40 Cal. App. 4th 1433, 1444-1445 (1995); Horvitz & Levy, MICRA Manual (2012), p. 176.

Next, the Court should order the United States to pay to plaintiffs any sums remaining awarded for non-economic damages and past economic damages after satisfying fees.  It is unlikely any such sums will be available in this case.

Then the Court should order the United States to pay the present value of the net award (after satisfying fees) for lost earning capacity and future damages into the Court registry, Fed. R. Civ. P. 67, or to accounts managed by a private bank.  The judgment should order the private bank to prudently invest the funds.  If deposited with the Court registry, Treasury will pay interest on those funds.  28 U.S.C. §§ 2041-2045.

The Court must also, with the assistance of the parties' experts and based upon its findings of fact, include in the judgment "the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made."  CAL. CIV. PROC. CODE § 667.7(b)(1).  The judgment should include separate schedules for lost earning capacity damages and future care damages. The judgment should order the private bank or the Court registry to make payments according to the schedules.

Finally, the judgment should provide that if I. Perez dies before all future care payments are made all funds, including accrued interest, remaining in the future care account revert to the United States.  *Id.* § 667.7(d).  For the lost earning capacity damages, the judgment should provide that if I. Perez dies before payments are complete a court of competent jurisdiction (with notice to the United States and an opportunity to be heard) shall determine if I. Perez "owed a duty of support [to any person], as provided

by law, immediately prior to his death," and whether any remaining funds, including accrued interest, should pass to those person(s) or escheat to the United States. *Id.* § 667.7(c).

### D. TRICARE.

The United States has never argued that I. Perez must obtain all his future medical care from military healthcare facilities. But the law and the evidence at trial conclusively established that *even if* I. Perez decides to treat with private healthcare facilities, TRICARE may still pay for those services. 32 C.F.R. § 199.6; Trial Tr. 1296:4-6 (Norma Perez) (TRICARE paid for birth of youngest daughter at non-military hospital); *OST, Inc.*, 140 Fed. Cl. at 664. And the Perez family may change their TRICARE plan. Trial Tr. 1235:10-12 (Israel Perez). If they do so, they may receive additional coverage for private care.

TRICARE coverage is not a collateral source. *Mays v. United States*, 806 F.2d 976, 977 (10th Cir. 1986). The United States funds TRICARE through appropriated funds. If the Court were to award damages to I. Perez for future medical care and then he were to receive reimbursement for the same medical care from TRICARE, the United States would be paying twice for the same injury. Congress never intended to waive the United States' sovereign immunity from double payments in the FTCA. *Brooks v. United States*, 337 U.S. 49, 53 (1949) (courts cannot compel the government "to pay twice for the same injury").

Thus, if the Court awards damages for future medical care, it should consider exercising its discretionary power to order a reversionary trust to avoid double payment by the United States. This way, the full amount of future medical care damages awarded by the Court will be available to I. Perez but, should the United States pay for those services through TRICARE, the United States will not have to pay twice. To obtain funds from this trust, I. Perez would only have to submit evidence of out-of-pocket payment for medical expenses identified in the Court's findings of fact that were not covered by TRICARE. The trust would then reimburse I. Perez the full amount of non-

covered out-of-pocket expenses.  Upon I. Perez's death, all funds remaining in the trust would revert to the United States.  I. Perez would be fully compensated and the United States would only pay once.

As previously noted by the United States, other Courts have adopted this approach. *Smith v. United States*, No. 09-cv-246, 2012 WL 3017704, at *20 (W.D. Pa. July 23, 2012); *MacDonald v. United States*, 900 F. Supp. 483, 487-88 (M.D. Ga. 1995).  The Court in *MacDonald* specifically addressed TRICARE.  900 F. Supp. at 487-88.

Accordingly, the United States request that the Court consider a reversionary trust, separate and apart from application of California's periodic payment statute, if it elects to award future medical care damages.

### E.    Comparable Judgments.

In the past several years, two California FTCA birth injury cases went to verdict. In *Veasley v. United States*, No. 12-cv-3053-WQH-WVG, 2016 WL 4262186, (S.D. Cal. Aug. 12, 2016), Judge Hayes awarded $4,940,852.11 in a birth-injury case arising out of care provided at NHCP.  In *I.P. v. United States*, No. 2:13-cv-1012-JAM-CKD, 2015 WL 6671561 (E.D. Cal. 2015), the Eastern District awarded $9,852,805 in a birth-injury case involving a community health center.

Looking to older cases with similar presentation, in 1999, this Court awarded $2,836,184 in a birth injury case where the minor suffered a seizure disorder, developmental delay, and hearing loss.  *Greenleaf v. United States*, 1999 Jury Verdicts LEXIS 52874.

## V.    CONCLUSION

The evidence presented at trial and the applicable law merit judgment in favor of the United States.  The team at NHCP managed Ms. Perez's labor and delivery within the standard of care.  While I. Perez's injuries are unfortunate, the weight of the evidence does not demonstrate that NHCP's labor management was a cause of substantial contributing factor to his injuries.

Dated June 3, 2019,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director, Torts Branch

ROGER D. EINERSON
Deputy Director, Torts Branch

 s/ Stephen R. Terrell
STEPHEN R. TERRELL
(Cal. Bar No. 210004)
Attorney
Torts Branch
United States Department of Justice
P.O. Box 888
Washington, DC  20044
(202) 353-1651 (phone)
(202) 616-5200 (fax)
Stephen.Terrell2@usdoj.gov

Attorneys for Defendant

UNITED STATES OF AMERICA


## CERTIFICATE OF SERVICE

I hereby certify that, on June 3, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notice of this filing to the following ECF participants:

Kenneth M. Sigelman (ken@sigelmanassociates.com)

Kenneth M. Sigelman & Associates

1901 1st Ave., 2nd Floor

San Diego, CA  92101

Attorney for plaintiffs.

1

2

3

                     s/ Stephen R. Terrell
                   STEPHEN R. TERRELL

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28