UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I. PEREZ, a minor, by and through his Guardian ad Litem, Israel Perez; and NORMA PEREZ,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et. al.,<br><br>Defendant. | Case No.:  16cv01911 JAH-MDD<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER** |

**INTRODUCTION**

I. Perez, a minor, through his Guardian ad Litem, Israel Perez, and Norma Perez seek damages for injuries resulting from Defendant United States of America's negligence during I. Perez's birth. Kenneth Sigelman and Andrew Chivinski appeared on behalf of Plaintiffs and Stephen Terrell appeared on behalf of Defendant at trial.

After hearing testimony and argument of counsel at the trial, the matter was taken under submission. The parties filed separate supplemental briefs following trial. Having considered the testimony and argument presented by the parties at trial and the supplemental briefs, this Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. On December 31, 2013, Norma Perez presented to Naval Hospital Camp Pendleton ("NHCP") at approximately 1:00 a.m. She was pregnant with I. Perez.

2. Norma Perez had previously delivered three children vaginally with no complications.

3. While in triage at NHCP, Norma Perez was connected to the electronic fetal monitor which monitors fetal heart rate ("FHR") and a mother's uterine activity. The purpose of fetal monitoring during labor is to evaluate the adequacy of fetal oxygenation during labor.

4. NHCP staff noted variable decelerations on the electronic fetal monitor while Norma Perez was in triage.

5. A variable deceleration is an abrupt drop in FHR lasting more than 15 seconds but less than 2 minutes. Variable decelerations are generally caused by umbilical cord compression which cuts off oxygen to the baby. Severe variable decelerations for a long period of time suggests the baby is at risk of suffering injury.

6. NHCP staff admitted Norma Perez to Labor and Delivery at 1:30 a.m. because of the variable decelerations and notified the obstetrician. The obstetrician was advised that Ms. Perez was admitted to the hospital after having arrived with deep variable decelerations due to concerns for the possible need of a surgeon.

7. The obstetrician performed duties as the consulting obstetrician on duty at NHCP and did not have primary care responsibilities for Norma Perez.

8. NHCP staff developed a management plan that included IV bolus, position changes, and oxygen. These are intrauterine resuscitative measures intended to increase oxygenation to the baby and cause identified variable decelerations to return to baseline.

9. In response to continuing variable decelerations between 1:30 a.m. and 2:36 a.m. NHCP repositioned Norma Perez, administered an IV bolus, administered

Terbutaline to slow uterine contractions and called the obstetrician. The fetal heartbeat temporarily returned to baseline at 2:42 a.m.

10. During cross-examination, a NHCP nursing staff's attention was directed to an exhibit (a fetal monitoring strip) relating to the 6-minute variable deceleration at 2:36 a.m. The witness's verbal response and non-verbal demeanor – her unnerving physical reaction to the evidence - clearly reflected the staff's oversight of that significant, prolonged variable deceleration episode in the management and monitoring of the care for I. Perez and Norma Perez.

11. Expert witness Albert Phillips, M.D. identified the prolonged deceleration lasting for six (6) minutes beginning at 2:36 a.m. and additional variable decelerations that were not timely addressed by the staff, as having a significant negative impact on the health and well-being of I. Perez.

12. Based upon the expert testimony and all the evidence in the case, it is reasonable to conclude that the events in paragraphs 10 and 11 were significant, defining moments in I. Perez's care, or lack of care, and a substantial cause or factor resulting in I. Perez's injury.

13. At 2:46 a.m., the obstetrician arrived at the beside of Norma Perez, examined her and noted severe to moderate variables that returned to baseline. Notwithstanding her knowledge that Norma Perez arrived at the hospital with variable decelerations, the obstetrician noted a plan to anticipate vaginal delivery unless indication for cesarean delivery occurs.

14. Recurrent variable decelerations resumed around 3:10 a.m. followed by another prolonged variable deceleration. No action was taken in response to the prolonged deceleration.

15. Additional variable decelerations occurred between 3:40 a.m. and 3:50 a.m. which NHCP staff considered a Category II with the fetal monitor strip moving towards a Category III. Labor and Delivery nurses are trained to contact a provider if they believe a strip is transitioning from Category II to Category III as such movement is

indicative of cesarean section delivery. The obstetrician was notified at approximately 4:00 a.m.

16. A severe variable deceleration occurred at 4:05 a.m. In response, NHCP staff repositioned Norma Perez and administered IV fluid bolus.

17. The obstetrician was called at 4:15 a.m. and arrived at 4:17 a.m. the obstetrician attempted a practice push and tried resuscitation measures including administering Terbutaline and performing an amnioinfusion at 4:26 a.m.

18. A cesarean section was ordered as soon as Norma Perez consented to a cesarean section at approximately 4:32 a.m. Norma Perez was moved to the operating room at 4:42 a.m. The cesarean section was performed at 4:57 a.m. and I. Perez was delivered at 5:01 a.m.

19. An Apgar scale scoring examination was administered on I. Perez at birth. An Apgar examination is a ten-point scale scoring system that is used as a predictor of life or death and the risk of brain injury in newborns. Up to two points are given for each of 5 parameters including heart rate, vigor, cry and tone. The Apgar score range for a normal healthy baby is 8 to 10. At birth, I. Perez was given an Apgar score of 1 at 1 minute, 4 at 5 minutes and 4 at 10 minutes.

20. I. Perez was transferred to Naval Medical Center San Diego shortly after birth. He was diagnosed with hypoxic ischemic encephalopathy which is a result of perinatal asphyxiation, He remained hospitalized for 6 weeks.

21. Norma Perez delivered a healthy child after the birth of I. Perez.

22. I. Perez suffers from cerebral palsy, spastic quadriplegia, seizures, cognitive impairment and visual impairment. He is incapable, and will continue to be incapable, of independently performing any activities of daily living, working or living on his own. Because of his brain injury, I. Perez will never graduate from mainstream schools, read books, play sports, obtain employment, pray, get married, or raise a family. He is unlikely to walk unassisted or experience a meaningful conversation with another person. He will be visually impaired his entire life. I.

Perez has established that he will be completely dependent upon third-party care for the remainder of his life.

23. As I. Perez's physical size and mental condition change with age, the ability of Norma Perez to manage all of I. Perez's non-medical needs and challenges will decrease. Additionally, I. Perez's medical needs will need the attention of a skilled medical provider having at a minimum a Licensed Vocational Nurse ("LVN") credential.

24. Israel Perez, I. Perez's father, received a GED, an associate degree, and a bachelor's degree in criminal justice, which he earned while on active duty in the United States Marine Corps. After his retirement, Israel Perez received a master's degree in Humanities. At the time of trial, Israel Perez was registered to begin a program at California State University, Dominguez Hills to receive a community college teaching credential.

25. Norma Perez graduated from high school, received vocational training, became a Certified Nurse Assistant, and obtained certification as a Medical Assistant. Her goal before giving birth to I. Perez was to return to school, graduate from college, and become a Registered Nurse ("RN"), and eventually, a Nurse Practitioner.

26. I. Perez has a half-sister who is an outstanding high school student and aspires to attend Harvard and become a lawyer. I. Perez has a half-brother who attends College of the Sequoias.

27. Children typically equal or exceed the educational attainments of their parents.

28. The educational accomplishments of I. Perez's siblings strongly suggest I. Perez would also equal or exceed the educational attainments of his parents.

29. I. Perez requires care at the LVN level because he requires skilled nursing care to position him quickly and carefully upon onset of a seizure to avoid choking/aspiration. He takes seizure medication which can only be administered by a nurse-level LVN or RN, and he must be fed by way of G-tube feedings.

30. Public school has resulted in numerous problems for I. Perez, including: (1) frequent changes in the nurse assigned to him, which disrupts continuity of care; (2) inability to properly feed I. Perez; and (3) placing I. Perez in a stander and/or supportive walker without his shoes, resulting in skin lesions on his toes.  I. Perez has established he reasonably requires private school placement.

## CONCLUSIONS OF LAW

**NEGLIGENCE**

1. California law applies in this action brought under the Federal Tort Claims Act.
2. To establish negligence under California law, Plaintiffs must prove, by a preponderance of the evidence (1) Defendant was negligent, (2) Plaintiffs were harmed, and (3) Defendant's negligence was a substantial factor in causing Plaintiffs' harm.
3. A medical service provider must exercise the level of skill, knowledge and care in diagnosis and treatment that other reasonably careful medical service providers would use in similar circumstances.  The level of skill, knowledge and care used by reasonably careful medical service providers is determined by expert witness testimony.
4. Causation must be proven within a reasonable medical probability based upon the expert testimony.
5. A substantial factor is more than a remote or trivial factor that a reasonable person would believe contributed to the harm.
6. The NHCP medical service providers fell below the standard of care when they failed to call for, advocate, recommend or perform an urgent cesarean section beginning at around 2:45 a.m. and continuing until 4:32 a.m. when the cesarean section was ordered.

7. A prolonged deceleration lasting for six (6) minutes beginning at 2:36 a.m. was a crucial pivotal period requiring urgent action and was a substantial factor contributing to the harm.

8. I. Perez suffered a hypoxic ischemic brain injury at birth as a result of the care provided by NHCP

9. The NHCP medical service providers' negligence in failing to call for, advocate, recommend or perform an urgent cesarean section prior to 4:15 a.m. was a substantial factor causing Plaintiff's injury.

10. Norma Perez suffered serious emotional distress as a result of the events of the labor and delivery.

11. The NHCP medical service providers' negligence was a substantial factor causing Norma Perez's injury.

**DAMAGES**

12. To recover damages for past medical expenses, Plaintiff must prove the reasonable cost of reasonably necessary medical care that he received. Plaintiff presented no evidence of damages for past medical expenses.

13. To recover damages for future medical expenses, Plaintiff must prove the reasonable cost of reasonably necessary medical care that he is reasonably certain to need in the future.

14. Plaintiffs prove I. Perez should receive reasonably necessary medical care not covered by Tricare in a manner that does not otherwise enhance the damages award findings as provided for herein.

15. Plaintiffs have proven damages for future medical care as detailed herein.

16. Except as otherwise provided for herein, expert witness Carol Hyland's recommendations (including calculations) for damages relating to medical services, medical supplies and medical equipment, education, housing and care, housing modifications and mobility equipment are adopted and found to be reasonably necessary for the ongoing, medical and attendant care of I. Perez.

17. In light of I. Perez's extraordinary medical needs and past experiences in public school settings, I. Perez has established that private school education is reasonably necessary at an <u>annual costs</u> of $52,920.00 from age 5 to age 6, an annual cost of $53,119.60 from age 6 to age 12, and an annual cost of $53,319.20 from age 12 to age 22.

18. The educational service need set forth in Carol Hyland's life care plan of a sheltered workshop or day activity program is reasonably necessary for I. Perez from ages 22 through 35 at a cost in an amount up to $85 per day for 6 hours a day for 48 weeks per year.

19. LVN attendant care is reasonably necessary for I. Perez from ages 3 through 35 at $42.67 per hour for 16 hours a day until age 18 and for 24 hours a day until age 35. I. Perez has not established by a preponderance of the evidence that LVN attendant care at home is reasonably necessary after age 35.

20. Facility care is reasonably necessary for I. Perez from age 35 to lifetime at $247.22 per day or $90,297.11 per year.

21. Chore services are reasonably necessary for I. Perez from ages 3 through 35, including: housekeeping at $121.5 per week or $6,318 per year; meal preparation and shopping for groceries at $23.80 per hour at 10 hours per week or $12,376.00 per year; yard services at $109.17 per month or $1,310.04 per year; and handyman services at $56.67 per hour or $1,360.08 per year.

22. Housing modifications are reasonably necessary for I. Perez. The reasonable cost of these modifications is $100,000.

23. A modified van every 8 years is reasonably necessary for I. Perez and reasonably certain to be required over his lifetime. The initial purchase of a van plus conversion or the purchase of a converted van shall be without contribution from the family or household in an amount up to $75,000. After the purchase of the initial van, the purchase of a standard van by the family is to be converted for I. Perez's

transportation needs at an annual and annualized costs of $8,540 per year and annual maintenance cost of $1,347.27.

24. I. Perez's life expectancy is estimated at age 58.5 years.

25. Plaintiffs' expert's method for determining the net discount rate for medical and care costs is reasonable. The proper rates for calculating present cash value are minus 0.9 and 0.7.

26. To recover damages for loss of the ability to earn money as a result of his injury, Plaintiff must prove it is reasonably certain that the injury he sustained will cause him to earn less money in the future than he otherwise would have earned and the reasonable value of the loss to him.

27. I. Perez proved by a preponderance of the evidence that, in the absence of his brain injury, he would likely have obtained a master's degree.

28. The expert testimony supports a net discount rate for calculating I. Perez's loss of future earning capacity of 0.4%.

29. The future/gross value of I. Perez's loss of future earning capacity is $22,711,543. The present value of I. Perez's loss of future earning capacity is $3,553,205.

30. To recover for future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress, I. Perez must prove that he is reasonably certain to suffer that harm. I. Perez has met his burden. This amount of non-economic damages should not be further reduced to present cash value because the reduction should only be performed with respect to economic damages.

31. I. Perez's non-economic damages are substantial.

32. However, under California law, which applies in this FTCA action, non-economic damages in medical malpractice cases are capped at $250,000.

33. I. Perez's past and future noneconomic damages exceeds the statutory cap of $250,000.

34. Norma Perez has spent a substantial amount of time providing extraordinary care to I. Perez since his birth as a result of his disabilities. The extraordinary care she provided and continues to provide includes: (1) giving medication for seizures twice per day and as needed if breakthrough seizures occur; (2) monitoring I. Perez on an ongoing basis to determine indicators or symptoms suggesting the onset of seizures; (3) continuing diaper changes after age 3; (4) total bathing assistance; (5) performing range of motion exercises with I. Perez throughout the day; (6) providing total assistance for I. Perez in all of his transfers approximately 10 times per day; (7) suctioning I. Perez from 5 to12 times per day; (8) total dressing assistance; (9) repositioning I. Perez in his chair approximately 10 times per day to avoid pressure ulcers; (10) carrying I. Perez; (11) performing special oral/dental care five times per day or more; (12) transporting I. Perez to therapy appointments approximately 2 to 4 times per week; (13) transporting I. Perez to and from doctor appointments and emergency room visits; (14) preparing meals by blending dietary foods and feeding I. Perez multiple times a day until I. Perez was switched to G-tube in 2018; and (15) preparing for and administering G-tube feedings which take one hour or more per feeding.

35. Due to I. Perez's disabilities, the extraordinary care that will continue to be required includes: (1) 5 hours per week over the first year of life; (2) 8-10 hours per week during the second year of life; (3) 20 hours per week from age 3 to the date of judgment.

36. I. Perez has proved that he is entitled to recover the reasonable value of extraordinary care provided by his mother from birth through the date of judgment based on a rate of $40 per hour.

37. I. Perez's damages shall be offset by $116,000 for past social security payments.

38. To recover for future mental suffering, loss of enjoyment of life, grief, anxiety, humiliation, and emotional mistress, Norma Perez must prove that she is reasonably certain to suffer that harm. Normal Perez has met her burden. This amount of

noneconomic damages should not be further reduced to present cash value because that reduction should only be performed with respect to economic damages.

39. Under California law, Normal Perez's non-economic damages are also capped at $250,000.

40. Norma Perez's noneconomic damages exceeds the statutory cap of $250,000.

41. Defendant invokes California's periodic payment statute, California Civil Procedure Code section 667.7. Section 667.7, reads, in relevant part:

(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages. As a condition to authorizing periodic payments of future damages, the court shall require the judgment debtor who is not adequately insured to post security adequate to assure full payment of such damages awarded by the judgment. Upon termination of periodic payments of future damages, the court shall order the return of this security, or so much as remains, to the judgment debtor.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED Plaintiffs are awarded the following damages:

**Non-Economic**

1. I. Perez $250,000
2. Norma Perez $250,000

**Economic**

1. Loss of Future Earning Capacity $3,437,205
2. Extraordinary Care by Parent to be calculated based on a rate of $40 per hour from birth through the date of judgment.
3. Future Medical and Care Costs to be calculated based up the amounts above.

    4.    Offset for Social Security Payments    -$116,000

IT IS FURTHER ORDERED the parties shall meet and confer on the issue of the payment of future damages by periodic payments and the schedule for such payments so as to assist the court in making final, specific findings as to the dollar amount of periodic payments which will compensate the judgment creditor. The parties shall file a joint stipulation on all damage calculations agreed upon, or file briefs of no more than ten (10) pages as to matters where there is no agreement. The stipulation or pleadings shall contain gross amounts and present value amounts awarded, future payments and a payment schedule based upon the findings contained herein, and a method of up-front payment of the full amount of attorney fees based upon a reduction of the amount of periodic payments only **on or before October 13, 2020**.

IT IS FURTHER ORDERED that damages allocated to Plaintiff's medical services from ages 3 through 18, medical supplies from ages 3 through 18, medical equipment from ages 3 through 18, the initial van purchase, the award for pre-judgment extraordinary care provided by Norma Perez and extraordinary non-economic damages suffered by Norma Perez shall not be subject to the up-front offset for payment of attorney's fees.

This order relating to payment of attorney fees approximates, as close as practicable, the intent of the California legislature and the balancing of that intent against the extraordinary care required by Plaintiff I. Perez to age 18 and his extraordinary non-economic damages and the extraordinary care provided by Norma Perez and the extraordinary non-economic damages suffered by Norma Perez.

DATED: September 15, 2020

_____
JOHN A. HOUSTON
United States District Judge